IK CORPORATION, Plaintiff-Appellant, v. ONE FINANCIAL PLACE PARTNERSHIP *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—88—1095

Opinion filed June 15, 1990.—Rehearing denied July 25, 1990.

Keevan D. Morgan, of Morgan & Bley, Ltd., and William J. Harte, of William J. Harte, Ltd., both of Chicago, for appellant.

Stephen P. Bedell, of Gardner, Carton & Douglas, of Chicago, for appellee First Options of Chicago, Inc.

Gerald L. Angst and Maripat Flood, both of Sidley & Austin, of Chicago, for other appellees.

JUSTICE MURRAY* delivered the opinion of the court:

Plaintiff, IK Corporation (IK), appeals from the decision and order of the trial court dismissing with prejudice plaintiff's seven-count complaint for failure to state a cause of action, when plaintiff failed to plead the essential formation elements of a commercial real estate contract. Plaintiff filed a seven-count amended complaint against One Financial Place Partnership (lessor), Robert Wislow, a managing partner of the lessor, U.S. Equities Realty, Inc., an exclusive leasing agent for the lessor, One Financial Place Corporation, an authorized agent of the lessor, Janet Burch, an agent and inside real estate broker for the lessor, and First Options of Chicago, Inc., the lessor's second largest tenant. The defendants filed a motion to dismiss. The trial court granted the motion with prejudice. This appeal followed. For the following reasons we affirm.

The hearing on defendants' motions to dismiss plaintiff's first amended complaint revealed the following.

On September 23, 1983, defendant First Options of Chicago, lessor's second largest tenant, leased floors 15 through 18 of the One Financial Place Building and obtained the right to lease additional space on the 19th floor. On February 21, 1986, First Options also leased space on the 14th floor to accommodate its expanding operations. In July 1986, First Options purchased a controlling interest of H.A. Brandt & Associates' capital stock (First Options-Brandt), and as part of the transaction, Brandt assigned its lease of the 28th floor to defendant First Options. Thus, as of July 1986, defendant First Options had a leasehold interest in floors 14 through 18 and the 28th floor of One Financial Place. First Options also had the right to lease the 19th floor upon the expiration of the current tenant's lease term.

First Options sought to keep its lease space in the One Financial Building to contiguous floors, so in August 1986, it requested the cancellation of its lease to the 28th floor and the relocation of the First Options-Brandt offices to the 19th floor. On August 12, 1986, defendant lessor agreed but made the agreement contingent on its ability to lease the 28th floor to Union Mutual Life Insurance Company. In October 1986, defendant lessor leased part of the 28th floor to Union

---

*Prior to his resignation, Justice R. Eugene Pincham was assigned to and heard oral arguments in the above case. Since Justice Pincham's resignation, the case was reassigned to Justice Murray, who has listened to the tapes and read the briefs.

Mutual for a term of five years beginning February 1, 1987, and began discussing the relocation of the current 19th-floor tenants when plaintiff inquired about leasing the 28th floor.

On October 14, 1986, Irving Kessler, president of plaintiff IK Corporation, met with defendant Janet Burch, a real estate broker for defendant lessor, to discuss leasing space on the 28th floor. Kessler alleges that during the meeting, Burch informed him that neither First Options nor First Options-Brandt had a lease to the 28th floor after December 12, 1986. Kessler further alleges that Burch stated that although Union Mutual Insurance Company had a leasehold interest to a small portion of the 28th floor, it was lessor's intention to relocate Union Mutual to the 36th floor so that plaintiff could lease the 28th floor.

On October 15, 1986, Janet Burch sent an introductory letter and a proposal memorandum to Mr. Kessler. The letter and proposal memorandum listed, with some degree of specificity, the terms upon which plaintiff could lease the 28th floor. The proposal memorandum described the areas to be leased, the duration of the lease, the rental price of the areas to be leased, and the time and manner of payment. Pertinent provisions of the introductory letter and proposal memorandum state as follows:

"The information in this booklet is designed to introduce you to One Financial Place, a new 40 story office tower on LaSalle Street.

1. *Area.* We will provide approximately 25,000 leasable square feet on the 28th floor of the mid-rise elevator bank for I.K. Corporation (I.K.). This floor offers unobstructed views in all directions, including the entire downtown business district and lakefront.

2. *Lease Term.* We will provide a six (6) year lease term commencing January 1, 1987.

3. *Base Rent and Rental Abatement.* *** Our mid-size floors lease at a net rate of $23,000; we have developed a special net rental structure for I.K. to control the entire 25,000 square feet on the 28th floor while paying a substantially reduced rent on only 17,000 square feet."

Also included in the proposal memorandum were terms intended to make the 28th floor an attractive and cost-effective leasehold for plaintiff. Such terms included: an option to renew the lease at the current market price: a $60,000 allowance for renovating the 28th floor; a savings of $30,000 on cable installation; five parking spaces in the garage at the current monthly rate; year-long access to the building;

around-the-clock security and surveillance cameras; smoke detectors and standby medical mobile treatment units; a combination of amenities that are unmatched by any other downtown office complex; and the prestige of being located in the same building with some of the reputable investment banking firms. The last paragraph of the proposal memorandum, however, stated as follows: "15. *Proposal Subject to prior leasing.* This proposal is subject to prior leasing, prior acceptance and lender approval."

On October 16, 1986, Kessler met with Wislow, a managing partner of lessor. Kessler alleges that Wislow reiterated statements that had been made by Burch, namely that neither First Options nor First Options-Brandt would have an interest in the 28th floor after December 1, 1986, and lessor was free to lease the 28th floor to plaintiff for a term beginning December 1, 1986.

On October 22, 1986, the day in which plaintiff alleges that the contract was formed, Kessler met with Fabian, the vice-president of defendant U.S. Equities & Realty Inc., and defendants Wislow and Burch. Plaintiff alleges that during the meeting, it offered and promised to enter into a lease on the "exact same terms" as were proposed by lessor in the proposal memorandum. Plaintiff further alleges that its offer differed from the proposal memorandum in only one respect, namely, lessor would pay one half of the cost of cancelling plaintiff's current lease. Plaintiff also alleges that after it had offered and promised to enter into the lease, Wislow, on behalf of lessor, accepted plaintiff's offer and promised to enter into a lease with plaintiff for the 28th floor.

On October 23, 1986, Fabian met with Schroeder, plaintiff's agent. Plaintiff alleges that during the meeting, Fabian stated that Union Mutual would be relocated to the 36th floor to make room for plaintiff; that First Options-Brandt would be moving to the 19th floor on December 1, 1986; and that most of the smaller tenants of the 19th floor had already been relocated in order to create space for First Option-Brandt's relocation.

An initial draft lease was presented to plaintiff during the October 23, 1986, meeting. Plaintiff alleges that the initial draft lease contained terms that were identical to the terms in the proposal memorandum with the exception that plaintiff's term of years in the building would change from a six-year term to a 5-year and 11-month term, and that plaintiff's operating and tax expenses would increase. Plaintiff alleges that it agreed to a lease term of 5 years and 11 months but disagreed with paying certain operating expenses and taxes. The initial draft lease, however, provided in paragraph 27(e)

that "(t)he instrument does not become effective as a lease or otherwise until executed and delivered by both Landlord and Tenant."

On October 31, 1986, Fabian and Schroeder again met to discuss the unresolved terms of the first draft lease. A second draft lease was prepared, and the second draft lease also contained a paragraph 27(e), which provided that "(t)he instrument does not become effective as a lease or otherwise until executed and delivered by both Landlord and Tenant." Plaintiff alleges that on November 3, 1986, Fabian signed and delivered certain correspondences and a "complete revised lease." On November 5, 1986, Schroeder picked up a copy of the current revised lease from lessor. Neither plaintiff nor lessor signed any of the draft leases or revised draft leases.

While plaintiff and lessor were discussing and revising draft leases to the 28th floor, First Options informed lessor, on November 7, 1986, that its current lease to floors 14 through 19 in the One Financial Building would not accommodate its expanding operations and, therefore, it was necessary to retain its lease to the 28th floor.

Plaintiff was therefore unable to obtain a lease to the 28th floor of the One Financial Place Building.

Plaintiff filed a complaint on December 15, 1986, to which the defendants answered by filing section 2—615 motions for judgment on the pleadings. (Ill. Rev. Stat. 1985, ch. 110, par. 2—615.) On April 10, 1987, plaintiff amended its complaint, seeking: (1) a declaratory judgment against lessor and First Options; (2) specific performance of the contract against lessor; (3) specific performance of the contract based on promissory estoppel against lessor; (4) damages for common law fraud against lessor; (5) damages for tortious interference with a contract against First Options and U.S. Equities; (6) damages for tortious interference with prospective economic advantage; and (7) damages for the violation of a statute against Winslow, Burch, U.S. Equities, First Options, and lessor. Defendants again filed section 2—615 motions. On August 18, 1987, plaintiff filed a supplemental amendment, but on October 27, 1987, the trial court dismissed plaintiff's seven-count amended complaint under section 2—615. After hearing oral arguments on November 3, 1987, the trial court entered a second order which stated that the October 27, 1987, dismissal order was with prejudice. Plaintiff filed a motion to reconsider or alternatively for leave to file another amended complaint, but it was denied on March 16, 1988. Plaintiff appeals.

■◄■ It is settled in Illinois that a motion to dismiss filed pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615) is proper only where the court can deter-

mine the relative rights of the parties solely from the pleadings. (*Teeple v. Hunziker* (1983), 118 Ill. App. 3d 492, 454 N.E.2d 1174.) In making its ruling, the trial court must examine all pleadings of the party opposing the motion to determine whether there are any material issues of fact or whether the controversy can be resolved strictly as a matter of law. (*Triangle Sign Co. v. Weber, Cohn & Riley* (1986), 149 Ill. App. 3d 839, 501 N.E.2d 315; *Baker-Wendell, Inc. v. Edward M. Cohon & Associates, Ltd.* (1981), 100 Ill. App. 3d 924, 427 N.E.2d 317; *Quaintance Associates, Inc. v. PLM, Inc.* (1981), 95 Ill. App. 3d 818, 420 N.E.2d 567; *David v. J. Elrod Realtors on Devon, Inc.* (1979), 75 Ill. App. 3d 449, 394 N.E.2d 583.) Moreover, a motion for judgment on the pleadings, "attacks the legal sufficiency of the complaint, and not the factual sufficiency." (*Cain v. American National Bank & Trust Co.* (1975), 26 Ill. App. 3d 574, 586, 325 N.E.2d 799, 808; *Hamer v. Village of Deerfield* (1975), 33 Ill. App. 3d 804, 338 N.E.2d 242.) Furthermore, a reviewing court should interpret the facts alleged in the complaint in the light most favorable to the plaintiff (*Farns Associates, Inc. v. Sternback* (1979), 77 Ill. App. 3d 249, 395 N.E.2d 1103), and if any ground relied upon by the trial court in granting the motion was proper, the trial court's judgment should be affirmed. (*Matchett v. Rose* (1976), 36 Ill. App. 3d 638, 344 N.E.2d 770.) With these rules in mind, we turn to the issues presented for review.

In the case at bar, plaintiff contends that the trial court erred in granting defendants' section 2—615 motions. Plaintiff further contends that the trial court applied an improper standard to the section 2—615 motions, and because thereof, extrinsic material was considered, improper factual determinations and conclusions of law were made, and well-pleaded facts were not taken as true. Plaintiff alleges that these procedural errors permeated and tainted the entire hearings, and resulted in a judgment which must now be reversed and remanded. Because the alleged procedural errors are inextricably linked to the alleged substantive errors on appeal, with respect to the declaratory action (count I) and specific performance (count II), we will address the procedural issue within the context of the substantive issues raised on appeal.

Plaintiff contends on appeal that the trial court erroneously concluded as a matter of law that there was no contract, even though it had earlier ruled that the lessor's offer contained the essential terms of a commercial real estate contract. Plaintiff argues that the trial court would have concluded that there was a contract, if it had properly construed the "subject to" language in paragraph 115 of the pro-

posal memorandum. Plaintiff further argues that the trial court also erroneously concluded that there was no contract when it misconstrued the language in clause 27(e) as a condition precedent to the formation of a contract. We disagree.

■ Decided cases in Illinois have expressed the view that parties' contemplation of the execution of a formal agreement in the future does not render prior agreements mere negotiation where the parties intend that the formal agreement will be substantially based upon the earlier agreement. (*Interway, Inc. v. Alagna* (1980), 85 Ill. App. 3d 1094, 407 N.E.2d 615; *Borg-Warner Corp. v. Anchor Coupling Co.* (1958), 16 Ill. 2d 234, 156 N.E.2d 513.) If, however, the parties intended the execution of a formal agreement as a condition precedent, then no formal contract arises until the formal agreement is, in fact, executed. (*Interway, Inc. v. Alagna* (1980), 85 Ill. App. 3d 1094, 1098, 407 N.E.2d 615, 618; *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 256 N.E.2d 44; 17 Am. Jur. 2d *Contracts* §28, at 364 (1964).) Consequently, the resolution of this issue depends on whether the parties intended the execution of a formal agreement as a condition precedent to the formation of a binding contract.

■ The determination of the intent of the parties to a contract may either be a question of law or fact. If the language in a contract is ambiguous, then the determination of its meaning is a question of fact and not to be resolved by a section 2—615 motion to dismiss. If, however, the language in the contract is unambiguous, then the construction of the alleged contract is a question of law and subject to a section 2—615 motion to dismiss. (*Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 365 N.E.2d 1028.) In addition, the Illinois Supreme Court has stated:

> "The primary object in construing a contract is to give effect to the intentions of the parties involved. Their intent must be determined solely from the language used when no ambiguity in its terms exists, and a strict construction of that language which reaches a different result from that intended by the parties should not be adopted." *Schek v. Chicago Transit Authority* (1969), 42 Ill. 2d 362, 364, 247 N.E.2d 886, 887.

In the case at bar, the language in clause 27(e) of the lease draft specifically provided that "the Instrument does not become effective as a lease or otherwise until executed and delivered by both Landlord and Tenant." The trial court determined that the language in clause 27(e) was unambiguous and, therefore, the parties' intent was clearly discernible from the writing itself. We agree with the trial court. Our review of the record does not support a contrary conclusion. The lan-

guage in clause 27(e) appeared in the first, second and revised first and second draft leases, but neither party objected to the inclusion of such language during negotiations. Moreover, custom and usage in the real estate business tends to indicate that the parties intended the execution and delivery of a formal agreement as a condition precedent to the formation of a binding contract. If the draft leases tended to evidence a binding contract, they would not customarily contain an express disclaimer stating that the parties do not intend to be bound until a more formal document is completed and executed. Since the draft leases have such a clause, we must conclude that the parties intended to enter nonbinding preliminary negotiation.

The trial court also determined that the "subject to" language in the proposal memorandum was unambiguous, and as a matter of law, the language expressed the intent of the parties that "prior leasing," "prior acceptance," and "lender approval" were conditions precedent to the formation of a binding contract. Plaintiff argues that the trial court disregarded the implied and expressed intent of the parties and found that a contract had not been formed. Plaintiff also argues that the "subject to" language was ambiguous and capable of being interpreted differently by reasonable men. We disagree.

■ The words "subject to" lend themselves to different interpretations depending on the context in which they are used. "Subject to," when used in the ordinary sense, means " 'subordinate to,' 'subservient to,' or 'limited by.' " (*Englestein v. Mintz* (1931), 345 Ill. 48, 61, 177 N.E. 746.) When, however, the words "subject to" are used in connection with contracts, these words usually mean a condition on a party's duty of performance and indicate that more is contemplated by the parties. (*El Reno Wholesale Grocery Co. v. Stocking* (1920), 293 Ill. 494, 127 N.E. 642; *Interway, Inc. v. Alagna* (1980), 85 Ill. App. 3d 1094, 1099, 407 N.E.2d 615.) More importantly, the fact that one party to the contract expected a different construction of the words "subject to" "is not sufficient to justify the application of an unusual construction of such language." *Englestein v. Mintz* (1931), 345 Ill. 48, 61, 177 N.E. 746.

In applying the foregoing principles to the case at bar, we must agree with the trial court's conclusion that the "subject to" language in paragraph 15 of the proposal memorandum was unambiguous. We also agree with the trial court's holding that, as a matter of law, the "subject to" language expresses the intent of the parties that prior leasing, prior acceptance and lender approval were conditions precedent to the formation of a binding contract.

IK accurately argues that whether a writing which contains the

essential terms of a contract but which contemplates the later execution of a contract is in fact a contract or merely a negotiation depends upon the intent of the parties. IK seeks a reversal and remandment of the case to introduce extrinsic evidence of the parties intentions.

■ A contract's meaning must be determined from the words or language used, and a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language. (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287, 458 N.E.2d 480, 481.) In the absence of ambiguity, a court must treat the language in a contract as a matter of law and construe the contract according to its language, not according to the constructions which the parties place on this language. (*J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.* (1990), 194 Ill. App. 3d 744, 748, 551 N.E.2d 340, 344.) Extrinsic evidence may be introduced to explain the meaning of an ambiguous contract provision, but the provision is not rendered ambiguous simply because the parties do not agree on its meaning. (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287, 458 N.E.2d 480, 481; *White v. White* (1978), 62 Ill. App. 3d 375, 378, 378 N.E.2d 1255, 1258.) When the intent of the parties can be ascertained by the plain language of the instrument, no disputed question of fact exists. (*Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.* (1985), 137 Ill. App. 3d 550, 484 N.E.2d 1178.) Parties may specifically provide that negotiations are not binding until a formal agreement is, in fact, executed. (*Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 365 N.E.2d 1028.) If the parties construe the execution of a formal agreement as a condition precedent, then no contract arises unless and until that formal agreement is executed. (*Interway, Inc. v. Alagna* (1980), 85 Ill. App. 3d 1094, 407 N.E.2d 615.) Moreover, where contract terms are clear and unambiguous, they must be given their ordinary and natural meaning and no parol evidence can be considered to vary their meaning. (*Lewis v. Loyola University* (1986), 149 Ill. App. 3d 88, 500 N.E.2d 47.) The terms involved in this contract are clear and unambiguous. The lease drafts, including the one sought to be specifically enforced, read in part:

> "Submission of this instrument does not constitute a reservation of or an option for the premises. The instrument does not become effective as a lease or otherwise *until executed by both Landlord and Tenant* \*\*\*." (Emphasis added.)

■ Unless the contract clearly specified its own meanings, the court must interpret the words or language of the contract with their common and generally accepted meanings. (*J.M. Beals Enterprises,*

*Inc. v. Industrial Hard Chrome, Ltd.* (1990), 194 Ill. App. 3d 744, 551 N.E.2d 340.) The terms "executed" and "delivered" and "landlord" and "tenant" have well-defined legal meanings. In *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.* (1985), 137 Ill. App. 3d 550, 484 N.E.2d 1178, the use of those words was held to create no landlord and tenant negotiation where the lessee sent a letter expressing an intent to finalize lease negotiations. Black's Law Dictionary defines "execute" as to perform all necessary formalities, as to make and sign a contract, or sign and deliver a note. (Black's Law Dictionary 509 (5th ed. 1979).) Additionally, the term "executed" imports the idea that nothing remains to be done. Black's Law Dictionary 509 (5th ed. 1979).

In *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.* (1986), 114 Ill. 2d 133, 500 N.E.2d 1, the court stated that even where the essential terms have been agreed upon, if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery.

This case involves a writing which IK claims is ambiguous. Whether or not a contract is ambiguous is a question of law. (*National Tea Co. v. American National Bank & Trust Co.* (1981), 100 Ill. App. 3d 1046, 427 N.E.2d 806.) A contract will be ambiguous if it is one capable of being understood in more senses than one. *Standard Steel & Wire Corp. v. Chicago Capital Corp.* (1975), 26 Ill. App. 3d 915, 326 N.E.2d 33.

In *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.* (1985), 137 Ill. App. 3d 550, 552, 484 N.E.2d 1178, 1181, in a fact situation similar to the instant case, this court concluded the terms that a lease would become effective "upon the execution and delivery by both Lessor and Lessee" were unambiguous and presented no issue of fact as to whether the terms were a condition precedent to the formation of a binding contract. The draft lease in *Ebert* provided for a condition precedent in language virtually identical to IK's lease drafts: "Submission of this instrument for examination does not constitute a reservation or an option for the premises. The instrument becomes effective as a lease upon the execution and delivery both by Lessor and Lessee." (*Ebert*, 37 Ill. App. 3d at 552, 484 N.E.2d at 1181.) The plaintiff argued that the words were ambiguous and "that the various conversations, writings, and proposed leases which passed between the parties during negotiations indicate ambiguities concerning the intent of the parties." (*Ebert*, 137 Ill. App. 3d at 558.) In *Ebert* the Illinois Appellate Court held:

"[Plaintiff's] argument, however, is contravened by the language of paragraph 17(g) in the proposed lease. *** The plain language of paragraph 17(g) indicates that the parties did not intend to be bound at any time prior to the final execution of the lease agreement. Since that final execution never occurred, no intent to be bound can be inferred." *Ebert*, 137 Ill. App. 3d at 558, 484 N.E.2d at 1184.

The plaintiff argued alternatively, as IK does here, "that a contract was created by defendant's *** letter wherein defendant expressed the intention to finalize the proposed lease within the next few weeks." (*Ebert*, 137 Ill. App. 3d at 559, 484 N.E.2d at 1184.) The court disagreed, and held that even if all the terms had been agreed upon, under the language of the draft lease, execution of a formal lease was a condition precedent to any binding agreement. *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.* (1985), 137 Ill. App. 3d 550, 484 N.E.2d 1178.

In our opinion the contract in this case is clear and unambiguous. The execution and delivery of the lease were conditions precedent to acceptance.

The trial court concluded that the terms "This proposal is subject to prior leasing, prior acceptance and lender approval contained in a proposal" were unambiguous and made prior leasing and prior acceptance of the involved space and lender approval conditions precedent to the proposed lease. IK argues that the terms are ambiguous and raised issues of fact.

First Options, which held leasing rights to the 28th floor as a successor to H.A. Brandt Associates, argues that as a matter of law the purported lease was subject to the stated conditions.

IK Corporation relies upon *Bournique v. Williams* (1922), 225 Ill. App. 12, where the court held that upon plaintiff's acceptance, defendant's offer became an enforceable promise. However, in that case, the court was dealing with written documents. The defendant made a written offer to plaintiff to either sell or lease real property. The plaintiff accepted in writing. Defendant's contention that a formal, written lease was contemplated was rejected.

"The mere fact that a written lease was in contemplation does not relieve either of the contracting parties from the responsibility of a contract which was already expressed in writing." *Bournique v. Williams* (1922), 225 Ill. App. 12, 21.

IK contends, based on *Bournique*, that it had a contract because the essential terms had been agreed upon. However, even where essential terms have been agreed upon, if the clear intent of the parties

is that neither will be bound until the execution and delivery of a written lease, no contract exists until execution and delivery. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.* (1986), 114 Ill. 2d 133, 500 N.E.2d 1.

Since we have concluded that no lease was created with IK because of the unambiguous language making execution and delivery conditions precedent to any lease, the court need not reach the issue of specific performance.

■■ IK argues that the trial court erroneously permitted the lessor to mend its hold. IK states that when the lessor refused to execute the final draft of the lease, the lessor stated that it could not enter the lease with IK because First Options was reasserting the Brandt lease. IK also states that lessor did not assert any other conditions excusing its refusal to execute the IK lease until after the plaintiff's attorney asserted IK's claim to the 28th floor. IK contends that raising a new condition violates long-established Illinois law. However, this is not a case where a party has switched his position at trial. IK had notice of the condition precedent relied on by the lessor when the condition was written into the proposed lease. Moreover, a party may justify an asserted termination, rescission, or repudiation of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later. *College Point Boat Corp. v. United States* (1925), 267 U.S. 12, 69 L. Ed. 490, 45 S. Ct. 199.

A party under our liberal civil procedure may plead as many causes of action, counterclaims, defenses, and matters in reply as it may have. (Ill. Rev. Stat. 1985, ch. 110, par. 2—613(a).) When a party is in doubt as to which of two or more statements of fact is true, he or she may, regardless of consistency, state them in the alternative or hypothetically in the same or different counts or defenses. A bad alternative does not affect a good one. (Ill. Rev. Stat. 1985, ch. 110, par. 2—613(b).) When a party knows the facts, but cannot be sure of the legal effect of those facts, he may plead inconsistent theories of recovery or defenses. *Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 370, 390 N.E.2d 417, 425.

IK claims promissory estoppel (count III), fraud (count IV) and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*) (count VII). IK relies on the charges in its complaint that all or some of the defendants misrepresented the tenancy condition of the 28th floor, indicating at one time that the Brandt lease had been terminated and at another time that it had not.

The trial court concluded that the issues presented by those counts were mixed questions of law and fact and that the representations were not actionable. The trial court correctly dismissed the counts relating to equitable estoppel and fraud.

■■■ In order to maintain an action for promissory estoppel, the law requires: (1) a promise which is unambiguous in its terms, (2) reliance by the party to whom the promise is made, (3) the reliance must be expected and foreseeable by the party making the promise, and (4) the party to whom the promise is made must rely upon the promise to his detriment. *Levitt Homes, Inc. v. Old Farm Homeowner's Association* (1982), 111 Ill. App. 3d 300, 315, 444 N.E.2d 194, 204.

■■■ A complaint in fraud must allege (1) that a false statement of material fact was made, (2) that the party making the statement knew or believed it to be untrue, (3) that the party to whom the statement was made had a right to rely on it and did so, (4) that the statement was made for the purpose of inducing the other party to act, and (5) that reliance by the person to whom the statement was made led to his injury. *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 441 N.E.2d 324.

■■■ Reasonable reliance is a required element of promissory estoppel and common law or statutory fraud. (*Huegel v. Sassaman* (1979), 75 Ill. App. 3d 414, 417-18, 393 N.E.2d 1361, 1365.) The plaintiff's charges with respect to those counts were fatally defective in a number of ways. First, assuming as we must that the charges were true, IK's reliance on said charges was not reasonable. It was not reasonable to rely on allegations that the 28th floor was available for rent in the absence of a lease for the space while additionally considering that the lease documents were conditioned on an execution and delivery of the documents. Further, defendants' alleged statements that the lease by Brandt had been terminated and the 28th floor was available are statements of law. As a general rule one is not entitled to rely on a representation of law since both parties are presumed to be capable of knowing and interpreting the law. (*City of Aurora v. Green* (1984), 126 Ill. App. 3d 684, 467 N.E.2d 610.) A simple contract with Brandt by IK would determine whether in fact its lease had been terminated. Finally, the statement about the availability of the 28th floor was contingent on future events, *i.e.*, Brandt's giving up of the floor, the landlord not renting it to another before the lease was executed, and IK's execution and delivery of the lease for the space. Opinions based on contingent or future events are not the basis of an action for fraud or promissory estoppel. *Parker v. Arthur Murray, Inc.* (1973), 10 Ill. App. 3d 1000, 1004, 295 N.E.2d 487, 490; *Gil-*

*liland v. Allstate Insurance Co.* (1979), 69 Ill. App. 3d 630, 388 N.E.2d 65.

There being no lease agreement between IK and lessors, and merely allegations as to the alleged availability of the 28th floor for leasing, IK does not meet the necessary elements of fraud and/or promissory estoppel. The trial court properly ruled on defendant's motion to dismiss those counts.

■■ IK charges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*). The trial court properly ruled in dismissing count VII, which alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.

Section 2 defines a deceptive practice as

"the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." Ill. Rev. Stat. 1981, ch. 121½, par. 262.

The representations must be shown to be material and must relate to a matter upon which the plaintiff could be expected to rely. (*City of Aurora v. Green* (1984), 126 Ill. App. 3d 684, 688, 467 N.E.2d 610, 613.) Even if the Act were applicable to this cause of action, IK's reliance on the alleged deceptive representations was not reasonable for the reasons previously discussed with regard to the promissory estoppel and fraud counts.

The Act is intended to give consumers a broader protection than a common law action for fraud and estoppel. (*Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300, 306, 476 N.E.2d 1259, 1263.) The Act is not intended to be used as a vehicle for transforming nondeceptive and nonfraudulent statements or omissions into actionable ones. *Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300, 306, 476 N.E.2d 1259, 1263.

Every individual breach of contract between two parties does not amount to a cause of action cognizable under the Act. (*Exchange National Bank v. Farm Bureau Life Insurance Co.* (1982), 108 Ill. App. 3d 212, 438 N.E.2d 1247.) Furthermore, the Act is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong. *Frahm v. Urkovich* (1983), 113 Ill. App. 3d 580, 447 N.E.2d 1007; *Exchange National Bank v. Farm Bureau Life Insurance Co.* (1982), 108 Ill. App. 3d 212, 438 N.E.2d 1247.

■■ IK finally charges that the trial court improperly dismissed its claims of tortious interference with contractual or business rela-

tions. The essential elements of the tort of inducing the breach of a contract are:

"(1) the existence of a valid and enforceable contract between plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of a contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 610, 480 N.E.2d 1176, 1182.

■■■ One of the essential elements of tortious interference is the existence of a valid contract between plaintiff and a third person. (*Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 551, 229 N.E.2d 514, 518.) Since we have found that the trial court properly found no valid contract between the parties, it necessarily follows that IK has no case for tortious interference with the contract.

At best, plaintiff's complaint reveals negotiations for a lease of the 28th floor of One Financial Plaza for a term of six years that never materialized into an executed and delivered lease contemplated by the contractual documents. Thus, neither a valid business relationship nor an expectancy existed between the parties.

■■■ The elements which establish a *prima facie* case of tortious interference with prospective economic advantage or expectancy area:

"(1) existence of a valid business relationship or expectancy;

(2) knowledge of the relationship or expectancy on part of the interferer;

(3) an intentional and malicious interference inducing or causing a breach of termination of the relationship or expectancy;

(4) resultant damage to the party whose relationship or expectancy has been disrupted." *Ancraft Products Co. v. Universal Oil Products Co.* (1980), 84 Ill. App. 3d 836, 844, 405 N.E.2d 1162, 1168.

■■■ Though contractual relationships are protected from third-party interference, in many cases the third party may be privileged to purposely bring about the breach of plaintiff's contract with another. (*Connaughton v. Gertz* (1981), 94 Ill. App. 3d 265, 269, 418 N.E.2d 858, 861.) Furthermore, with respect to tortious interference with IK's prospective business advantages, all interferences with another's business advantages are not actionable. For example, an agent or a corporate officer has a duty to protect the interest of his principle. (*H.F. Philipsborn & Co. v. Suson* (1974), 59 Ill. 2d 465, 474, 322

N.E.2d 45, 50.) Interference is also justified to protect one's financial interest. (*Bank Computer Network Corp. v. Continental Illinois National Bank & Trust Co.* (1982), 110 Ill. App. 3d 492, 500, 442 N.E.2d 586, 593.) No allegations are made that the so-called interference was anything other than the exercise by the lessor of rights that it otherwise possessed. Nothing suggests that the acts of any of the parties were intended to do anything other than further their own goals. Even if there were in the present case a valid contract that had been breached, it is indisputable that a party cannot tortiously interfere with its own contract. (*Affiliated Distillers Brands Corp. v. Gold Seal Liquors, Inc.* (1952), 13 Ill. App. 2d 249, 141 N.E.2d 659; *Parkway Bank & Trust Co. v. City of Darien* (1976), 43 Ill. App. 3d 400, 357 N.E.2d 211.) Finally, the acts that form the basis of a tortious interference must be acts directed at parties other than the plaintiff. (*Mitchell v. Weiger* (1980), 87 Ill. App. 3d 302, 409 N.E.2d 38.) The trial court properly dismissed the counts relating to tortious interference with a contract and interference with prospective business advantage.

IK argues that the trial court treated the section 2—615 motion to dismiss as a section 2—1005 motion for summary judgment by improperly relying on extrinsic materials and making inferences unfavorable to the plaintiff (IK).

We find these charges without procedural or substantive merit. This is a case of lengthy negotiations between the parties for a five-year lease that never materialized into a valid lease. After able argument, a conscientious trial judge granted the section 2—615 motion to dismiss.

After a review of the record, briefs and oral argument, this court can find no error justifying a reversal of the order of the trial judge. Accordingly, we affirm.

Judgment affirmed.

LORENZ, J., and COCCIA, P.J., concur.