USX CORPORATION, Plaintiff-Appellee, v. LIBERTY MUTUAL INSUR-
ANCE COMPANY *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—92—3565

Opinion filed December 16, 1994.

Thomas J. Keevers and Joseph P. Postel, both of Keevers & Hittle, of Chicago, for appellants.

Luanne Ellison, of Burke, Burns, Ellison & Pinelli, Ltd., of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

FACTS

On March 27, 1985, the codefendant, Turner Construction Company (Turner), and the plaintiff, American Bridge Division of the United States Steel Company (USX), began to negotiate an agreement whereby USX was to act as a subcontractor to erect the structural steel for the construction of a building at 190 South La Salle Street in Chicago, with Turner as the general contractor. At about that time, Turner submitted to USX a preprinted contract containing provisions in article XXIII thereof which required USX to "procure and maintain, at its own expense, until completion and final acceptance of the Work *** workers' compensation *** and *** comprehensive general liability insurance ***." Under the provisions of proposed article XXIII, Turner was to be "named as an additional insured under these policies of insurance." The limits of the proposed insurance to be procured by USX were $2 million.

Before this preprinted agreement was executed, USX sent a letter to Turner dated May 30, 1985 (hereinafter referred to as the Senneway letter), which stated as follows:

> "This is in reference to insurance requirements contained in our contract for the erection of steel on the above project.
>
> We enclose copies of certificates attesting to our authority to act as self-insurers of our Worker's Compensation risks in the State of Illinois.

We also ordinarily self-insure our Public Liability and Property Damage risks arising out of our construction activities. Therefore, with respect to Public Liability and Property Damage Insurance as required by our contract, American Bridge Division, United States Steel Corporation, by this undertaking, hereby itself assumes all such risks instead of providing insurance."

Pursuant to the Senneway letter, the insurance procurement provisions of article XXIII of the preprinted contract were stricken, and on June 13, 1985, the contract was executed in final form and the stricken provisions of article XXIII were initialed by both parties.

On February 1, 1986, a construction employee of USX filed suit against Turner for alleged violation of the Structural Work Act (740 ILCS 150/1 *et seq.* (West 1992)) resulting from an injury sustained at the construction site in question on September 11, 1985. Turner tendered its defense to USX. On November 10, 1988, USX accepted the tender under a reservation of rights in a letter (hereinafter referred to as the Ellison letter) which stated in pertinent part:

"As you know, Jack Senneway's letter of May 30, 1985 confirmed that as a self-insurer ABD [American Bridge Division, USX] would assume the insurance requirements itself in lieu of purchasing commercial insurance. The contract placed limits on ABD's liability of $2,000,000 per occurrence and $2,000,000 in the aggregate. Beyond that amount ABD is not required to defend or indemnify. All rights in this regard are reserved."

Pursuant to the Ellison letter, USX retained the law firm of Querry and Harrow Ltd. to represent Turner in the Polk lawsuit.

More than two years later, on October 30, 1991, Querry and Harrow obtained leave of court to withdraw as attorneys for Turner. In their motion, Querry and Harrow stated that they had received written instructions from Turner to file a third-party action for contribution against USX as Polk's employer but that USX instructed them to disregard those instructions. Thereafter, on May 24, 1991, USX filed a declaratory action against Turner and Liberty Mutual, as Turner's insurer, seeking a declaratory judgment that USX did not owe Turner a defense or indemnification in the Polk lawsuit. On November 14, 1991, USX filed an amended complaint seeking the same relief. On June 21, 1992, USX filed a motion for summary judgment.

On April 15, 1992, the trial court entered summary judgment in favor of USX, stating:

"I further find the language of the contract is plain, unambiguous, and it does not need extrinsic evidence, letters, et cetra, [sic] of any sort in order to *** make a decision."

In November of 1991, following the filing by USX of its amended

complaint for declaratory judgment, defendants, Liberty Mutual Insurance Company and Turner Construction Company, filed their counterclaim seeking a declaration of USX's liability to pay up to $2 million on the underlying tort claim of Daniel Polk together with attorney fees. On May 13, 1992, following the grant of summary judgment in favor of USX, the defendants sought leave to file an amended counterclaim adding a count for promissory estoppel. Contemporaneously, they moved to reconsider and vacate the summary judgment. On July 8, the court granted leave to defendants to file their amended counterclaim.

Subsequently, a motion to dismiss that counterclaim was filed. On September 18, 1992, the court denied the motion of defendants to reconsider and vacate the summary judgment and granted the motion of USX to dismiss the amended counterclaim by reason of that summary judgment.

For the reasons stated below, we affirm the judgment of the trial court.

## OPINION

■ Defendants first contend that the trial court erred in its determination that the Senneway and Ellison letters were inadmissible and that resultantly the contract between Turner and USX was devoid of any undertaking by USX to provide insurance for Turner. We agree with this contention. In reaching its conclusion, the trial court determined that the policy was not ambiguous and therefore could not permit extrinsic evidence such as the two letters in question to vary its terms.

We do not disagree with the underlying legal proposition that the admissibility of these letters cannot be predicated upon the parol evidence rule, which requires a showing of ambiguity. We believe, however, that the trial court misconstrued the nature and purpose of these two letters. We recognize that without these two letters the insurance contract is not ambiguous, since as far as the preprinted agreement was concerned the requirement that USX provide Turner with insurance was stricken and therefore nonexistent.

However, the Senneway letter did not function merely as extraneous evidence of the intent of the parties in their execution of the preprinted insurance agreement. This letter was a counterproposal to the insurance requirements of article XXIII and must therefore be characterized as an integrated part of the agreement itself. See *McDonald's Corp. v. Butler Co.* (1987), 158 Ill. App. 3d 902, 511 N.E.2d 912; *Sudeikis v. Chicago Transit Authority* (1980), 81 Ill. App. 3d 838, 401 N.E.2d 1114.

It is a well-established principle of contract interpretation that,

> "in the absence of evidence of a contrary intention, where two or more instruments are executed by the same contracting parties in the course of the same transaction, the instruments will be considered together and construed with reference to one another because they are, in the eyes of the law, one contract." *In re Estate of Croake* (1991), 218 Ill. App. 3d 124, 126, 578 N.E.2d 567, 568.

Under this analysis the Ellison letter should have been admitted along with the Senneway letter. Although the Ellison letter was drafted in November 1988, more than three years after the contract between Turner and USX was entered into, it would be admissible to help establish the intent of the parties to include the counterproposal of the Senneway letter as a part of their contract. The admissibility of that letter would not be violative of the parol evidence rule where, as here, it is not used to vary the manifest intent of the parties as expressed in their agreement but rather to identify writings which were intended by the parties to contain and reflect the terms of the agreement into which they entered.

> "To prove that the two documents are part of the same transaction or constitute but one contract, parol and extrinsic evidence are admissible because such evidence tends to merely identify what the contract is rather than to vary or change the terms of a contract. [Citations.]" *Sudeikis*, 81 Ill. App. 3d at 841, 401 N.E.2d at 1117.

Accord *McDonald's Corp. v. Butler Co.*, 158 Ill. App. 3d 902, 511 N.E.2d 912.

■ Plaintiff, USX, urges that even if the trial court erred in predicating its grant of summary judgment upon the theory that the Senneway and Ellison letters were inadmissible extrinsic evidence, its grant of summary judgment must still be upheld on other grounds. It urges that even if we find that Turner is correct in its assertion that the Senneway letter contained a promise to cover Turner under USX's self-insurance program, a contention disputed by USX, that promise would be void and unenforceable under the provisions of the Construction Contract Indemnification for Negligence Act (740 ILCS 35/0.01 *et seq.* (West 1992)) (hereinafter referred to as the Indemnity Act). Section 1 of that statute provides that with respect to construction contracts:

> "[E]very covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable." (740 ILCS 35/1 (West 1992).)

USX contends that this provision applies whether the promisor characterizes his promise as an agreement to indemnify or as an

agreement to include the promisee within the promisor's self-insurance program.

The rule is clear that while contracts to indemnify a party for the negligence of the indemnitee are void, contracts to procure insurance to cover the negligence of such third parties are valid and enforceable. See *Duffy v. Poulos Brothers Construction Co.* (1991), 225 Ill. App. 3d 38, 587 N.E.2d 1038; *Jokich v. Union Oil Co.* (1991), 214 Ill. App. 3d 906, 574 N.E.2d 214.

The rationale of the Indemnity Act in voiding contracts to indemnify a third party for its own negligence was articulated by the Illinois Supreme Court in *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881, stating:

> "The statute [section 1 of the Indemnity Act] would thwart attempts to avoid the consequences of liability and thereby insure a continuing motivation for persons responsible for construction activities to take accident prevention measures and provide safe working conditions." (61 Ill. 2d at 499, 336 N.E.2d at 884.)

The foregoing rationale of the Indemnity Act to invalidate contracts to indemnify the promisee for its own negligence was not extended by the legislature to prohibit the procurement of contracts of insurance. Section 3 of the Indemnity Act expressly provides that "[t]his Act does not apply to construction bonds or insurance contracts or agreements." 740 ILCS 35/3 (West 1992).

In *Capua v. W.E. O'Neil Construction Co.* (1977), 67 Ill. 2d 255, 367 N.E.2d 669, the Illinois Supreme Court in an attempt to reconcile the policy reflected under section 1 of the Indemnity Act, which voids contracts requiring indemnification for one's own negligence, with section 3, which preserves contracts of insurance insuring against one's own negligence, states:

> "[Section 3] protects the interests of construction workers and members of the general public who may suffer injury through improper construction or maintenance by preserving supplemental sources of compensation for injured persons, namely insurance and indemnifying and hold-harmless agreements in construction bonds. ***
>
> In *Davis [v. Commonwealth Edison Co.]*, this court said that section 1 may well have been intended by the legislature to protect the construction worker and the general public from suffering construction-related injuries by encouraging accident-prevention measures. Today we observe that section 3 well may have been intended by the legislature to protect construction workers or members of the general public who have suffered construction-related injuries allowing them recovery against construction-bond sureties. As can be seen, sections 1 and 3 are harmonious; they ev-

idence a legislative intendment to protect the interests of the construction worker and the general public." 67 Ill. 2d at 260-61, 367 N.E.2d at 671-72.

Accord *Jokich v. Union Oil Co.*, 214 Ill. App. 3d 906, 574 N.E.2d 214.

The explicit preservation of insurance contracts under section 3 of the Indemnity Act was repeatedly held to apply to contracts by a subcontractor to procure insurance on behalf of the contractor as well as to actual insurance agreements between the insured and the insurance carrier. See, *e.g.*, *Zettel v. Paschen Contractors, Inc.* (1981), 100 Ill. App. 3d 614, 427 N.E.2d 189, stating:

> "An agreement to obtain insurance is not an agreement of insurance; a person promising to obtain insurance does not by that promise become an insurer although he may assume the liabilities of one if he breaches the agreement. [Citations.] *** Under an indemnity agreement, the promisor agrees to assume all responsibility and liability for any injuries or damages. Under an agreement to obtain insurance the promisor merely agrees to procure the insurance and pay the premium on it. Once the insurance is obtained, the promisor bears no responsibility in the event of injury or damage, even if the insurer should breach the insurance agreement through no fault of the promisor." 100 Ill. App. 3d at 617-18, 427 N.E.2d at 191-92.

See also *Duffy v. Poulos Brothers Construction Co.*, 225 Ill. App. 3d 38, 587 N.E.2d 1038; *Jokich v. Union Oil Co.*, 214 Ill. App. 3d 906, 574 N.E.2d 214.

The question remains, however, whether a promise by a subcontractor to include a contractor's negligence under the subcontractor's program of self-insurance should be treated as a void contract of indemnity under section 1 of the Act or as a valid contract of insurance under section 3 of the Indemnity Act.

There is no precedent which deals specifically with this issue in Illinois. Nor have the parties been able to cite to any authority on this specific point from any other jurisdictions. However, we note in the seminal case of *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881, where the court upheld the constitutionality of the Indemnity Act, this question was broached from the opposite direction. There an architect (Bonesz) was joined as a defendant in a tort action brought under the Structural Work Act. The architect cross-claimed against his codefendant, the general contractor, for indemnity pursuant to a contract which obligated the general contractor to pay all claims and judgments against the architect regardless of whether or not the underlying injury was caused by the architect's own negligence.

One of the arguments made by the architect was that the distinc-

tion in the Indemnity Act between section 3, allowing the insurance, and section 1, prohibiting indemnity, was an arbitrary one. In response the court observed:

> "Bonesz [one of the defendants] states that one can avoid the operation of section 1 and can make a construction agreement for indemnity enforceable simply by placing the provision in a construction bond or insurance contract. Thus, it is argued, section 3 creates an arbitrary and irrational exception to section 1. The argument does not persuade. Section 3 simply makes it clear that section 1 is not directed at the purchase of bonding or insurance agreements to assure performance or the satisfaction of liability." (61 Ill. 2d at 503, 336 N.E.2d at 886.)

There is at least some indication from the tenor of the language in *Davis* that section 3 is intended to apply only to insurance which is purchased, *i.e.*, insurance which is commercially obtained. (See also *Duffy v. Poulos Brothers Construction Co.*, 225 Ill. App. 3d at 42-43, 587 N.E.2d at 1042 (where the court held that a contractor who breaches his promise to procure liability insurance for an owner may be compelled to indemnify any resultant liability to a third party. In explaining why the contract to procure insurance remains valid while a contract to indemnify is void, the *Duffy* court stated:

> "In contrast to a contract of insurance, under an agreement to obtain insurance, *the promisor does not become the insurer or otherwise assume personal liability* for injuries or damages for which the promisee may be liable. The promisor merely agrees to obtain the coverage and pay the premium for it. Once the insurance is obtained, the promisor bears no responsibility in the event of injury or damages, and is not liable even if the insurance carrier breaches the insurance contract through no fault of the promisor.") (Emphasis added).)

Thus, in their reasoning, both *Davis* and *Duffy* seemingly indicate that while a contract compelling a subcontractor to procure insurance would be valid as a logical extension of section 3 of the Indemnity Act, compelling a subcontractor to itself become an insurer is not.

Although there do not appear to be any direct precedents on this point, conceptually there is no apparent difference between a promise on the part of a subcontractor to indemnify and a promise to include the promissee under the promisor's self-insurance program. The difference is largely one of semantics. Arguably, the term "self-insurance" appears to be nothing more than a term denoting that there is no insurance. But whether or not it is referred to as "self-insurance," it is in fact a mere private promise to indemnify. (See R. Keeton & A. Widiss, Insurance Law § 1.3, at 13-14 (1988) (stating:

"Risk transference or risk distribution may be accomplished without using insurance. If one entity, such as a corporation or a governmental agency, engages in a sufficient volume of ventures of a given type, the risks of all the ventures in the group can be spread by the enterprise acting on its own ***. Although an entity that handles the risk of tort claims in this manner is sometimes referred to as a 'self-insurer,' this approach involves no insurance as the term is ordinarily used in regulatory statutes or in other legal contexts").)

This language was also adopted in *In re Mission Insurance Co.* (1991), 112 N.M. 433, 816 P.2d 502. See also *Physicians Insurance Co. v. Grandview Hospital & Medical Center* (1988), 44 Ohio App. 3d 157, 542 N.E.2d 706 (self-insurance is the "antithesis" of insurance as it is the retention of the risk of loss by one upon whom it is directly imposed by law or contract). *Cf.* Annot., 46 A.L.R.4th 708, 710 (1988):

" 'Insurance' has been defined as a contract through which one party indemnifies another against loss due to certain specified contingencies, [footnote] but the term 'self-insurance' has no precise legal meaning. In a sense, all risks not otherwise insured are 'self-insured.' "

Defendants contend that the term "self-insurance" should be distinguished from indemnity because self-insurance requires State certification or approval. This assertion is wholly unsupported. The only self-insurance programs which require any State approval are those designed to satisfy a specific statutory requirement of insurance such as the insurance requirement under the Workers' Compensation Act (see 820 ILCS 305/4 (West 1992)) and the financial responsibility provisions of the Illinois Vehicle Code (see 625 ILCS 5/7—502 (West 1992)). In each of these instances the statute itself provides for self-insurance as an alternative to commercial insurance to assure the availability of adequate sources of funding to pay damages in the event of liability. And in each of these instances the respective statutes provide for State certification as a prerequisite for allowing "self-insurance" to substitute for commercially obtained insurance. See, *e.g.,* 625 ILCS 5/7—502 (West 1992) (which provides:

"Self-insurers. Any person in whose name more than 25 motor vehicles are registered may qualify as a self-insurer by obtaining a certificate of self-insurance issued by the Director of the Department of Insurance as provided in this Section.

The Director may, in his discretion, upon the application of such a person, issue a certificate of self-insurance when he is satisfied that such person is possessed and will continue to be possessed of ability to pay judgment obtained against such person").

■ This approach is wholly inapplicable in the context of the

Indemnity Act. Unlike the Indemnity Act, the Illinois Vehicle Code and the workers' compensation statutes do not deal at all with the public policy issue of indemnifying a third party for his own negligence. They seek only to assure availability of funds to cover damages for which an automobile driver or employer may become liable. Consequently, the Workers' Compensation Act and the Illinois Vehicle Code expressly allow insurance to be bypassed where financial responsibility can be adequately established by the prospective tortfeasor himself.

However, no such rationale for the allowance of self-insurance is provided under the indemnity statute. There is no provision in the Indemnity Act to allow for the substitution of self-insurance in the place of actual insurance. Moreover, there is no provision to allow for State certification or to invest any State agency including the director of insurance with power to certify any self-insurance plan for that purpose.

We further note that, in those States where respective financial responsibility laws expressly permit a party to substitute certified self-insurance for actual insurance, the cases have for the most part held that such self-insurance is not to be confused with actual insurance and would therefore not be encompassed within the "other insurance" clauses commonly contained in commercially obtained liability insurance policies. (See, *e.g.*, *Southeast Title & Insurance Co. v. Collins* (Fla. Dist. Ct. App. 1969), 226 So. 2d 247.) For example, in *Collins* an employee was in an accident while driving his employer's vehicle. The employer had a State-certified self-insurance program to satisfy the State's financial responsibility law covering his automobile liability and that of his employees. The employee was insured under a separate automobile liability policy which he purchased from a commercial insurance carrier. His policy provided that it was to be excess insurance over "any other valid and collectible insurance." In rejecting the attempt to apply that excess clause against the employer's self-insurance, the court held that the term "insurance" was not applicable to self-insurance where a party held a certificate from the State insurance commission attesting it had furnished sufficient proof of financial responsibility. Accord *Home Indemnity Co. v. Humble Oil & Refining Co.* (Tex. Civ. App. 1958), 314 S.W.2d 861; *American Family Mutual Insurance Co. v. Missouri Power & Light Co.* (Mo. 1974), 517 S.W.2d 110 (qualification as self-insurer under State financial responsibility law did not constitute other valid and collectible insurance). See also *Physicians Insurance Co. v. Grandview Hospital & Medical Center* (1988), 44 Ohio App. 3d 157, 542 N.E.2d 706 (characterizing self-insurance as the "antithesis" of insurance

since it is the retention of the risk of loss by one upon whom it is directly imposed by law or contract).

Illinois appears to have aligned itself with the majority in rejecting attempts by commercial carriers to treat self-insurance as "other insurance." See *Aetna Casualty & Surety Co. v. James J. Benes & Associates, Inc.* (1992), 229 Ill. App. 3d 413, 593 N.E.2d 1087 (membership in intergovernmental risk management pool is self-insurance and therefore does not entitle commercial insurance carrier to seek equitable contribution from it). *Cf. Antiporek v. Village of Hillside* (1986), 114 Ill. 2d 246, 499 N.E.2d 1307 (membership in intergovernmental risk management pool does not activate waiver of municipal tort immunity).

We note that in *Southern Home Insurance Co. v. Burdette's Leasing Service, Inc.* (1977), 268 S.C. 472, 234 S.E.2d 870, where the court espoused the minority position that certified self-insurance should be deemed "other valid collectible insurance," the court nevertheless recognized the ersatz nature of self-insurance. It conceded that technically a self-insurer was not an insurer at all but the court reasoned that in permitting self-insurance to substitute for real insurance under the financial responsibility law, the legislature intended that such substituted self-insurance be treated as if it were actual insurance even though self-insurance is not true insurance. See generally Annot., 46 A.L.R.4th 707, 713-14 (1986).

■ Consequently, we cannot agree that by characterizing the subcontractor's promise of indemnity as a promise to include the contractor as an insured under the subcontractor's self-insurance program, such characterization would serve to invoke the insurance exception under section 3 of the Indemnity Act and thereby avoid the impact of section 1 of that act. Moreover, if, under the provisions of the Indemnity Act, a distinction were to be made between self-insurance and indemnity there would be little, if anything, left of the prohibition under section 1 of that act. The contractor would simply substitute a requirement that the subcontractor "insure" the contractor against its negligence rather than deploy the term "indemnify."

■ Turner contends that the promise to insure under its self-insurance program should not be invalidated because it purports to limit its "coverage" to $2 million. It contends that this limitation keeps alive the promissee's incentive to maintain safety in order to avoid exposure to liability and therefore comes within the scope of the rationale which section 1 of the Indemnity Act seeks to implement. See *Davis v. Commonwealth Edison Co.*, 61 Ill. 2d 494, 336 N.E.2d 881.

We do not find that argument to be persuasive. If we did, then

the same rationale would equally apply whether the promise was for straight indemnity or for inclusion on a self-insurance program. The fact is that promises to provide partial indemnification for the indemnitee's own negligence can be seen to dilute, if not totally eliminate, the promisee's incentive to implement proper safety practices. Moreover, here the limit is relatively high ($2 million) and the risk of incurring liability beyond that amount is obviously reduced substantially. To hold otherwise would permit the preclusive provision of section 1 of the Indemnity Act to be circumvented simply by putting a cap, no matter how high, upon the indemnitor's liability.

Having determined that the USX proposal to include Turner under its self-insurance program is contractually invalid under section 1 of the Indemnity Act, USX's proposal must correspondingly fail under promissory estoppel as well. The doctrine of promissory estoppel requires the following elements to be pleaded and proved: (1) that the promise is unambiguous; (2) that reliance by the promisee occurred and was expected and foreseeable; and (3) that the party to whom the promise was made did, in fact, rely upon it to its detriment. See *IK Corp. v. One Financial Place Partnership* (1990), 200 Ill. App. 3d 802, 558 N.E.2d 161.

■ We disagree with the contention of USX that the counterproposal as submitted cannot be construed as being an unconditional promise upon which Turner would have been entitled to rely. There can be little doubt from the facts pleaded and extrinsically submitted that the elements necessary to invoke the doctrine of promissory estoppel were sufficiently established. There can be no question that these elements were sufficiently presented to raise material issues of facts to preclude the entry of summary judgment. See *Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill. 2d 281, 565 N.E.2d 990.

However, notwithstanding that the elements of promissory estoppel may well have been otherwise established, one cannot deploy the doctrine of promissory estoppel to enforce a promise which contravenes public policy and is resultantly unenforceable as a contract. See *Broverman v. City of Taylorville* (1978), 64 Ill. App. 3d 522, 381 N.E.2d 373; *Board of Education South Stickney School District No. 111 v. Murphy* (1978), 56 Ill. App. 3d 981, 985, 372 N.E.2d 899, 901.

While we do not condone the marketplace ethics which permit a business entity to renege upon an accommodation which it requested, we must correctly apply the law even where it appears on occasion to generate undeserved benefits. Under such circumstances one must rely upon the interest of such commercial entities in maintaining their competitive positions within the business community to discour-

age persistent conduct of this nature even though beyond the corrective reach of our legal system.

The same reasons which warrant summary judgment in favor of the declaratory judgment complaint of USX justify the dismissal of the counterclaim of Turner and Liberty Mutual. Both the complaint and counterclaim pivot upon the enforceability of the promise contained in the Ellison letter. Since we have determined that promise to be unenforceable under section 1 of the Indemnity Act, it is inevitable that USX must prevail in its declaratory action and Turner and Liberty Mutual must fail in their counterclaim.

For the forgoing reasons, summary judgment of the trial court in favor of USX on its complaint for declaratory judgment and the dismissal with prejudice of the amended counterclaim of Turner and Liberty Mutual are affirmed.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.