In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2239

OCEAN ATLANTIC
DEVELOPMENT CORPORATION,

*Plaintiff-Appellant,*

*v.*

AURORA CHRISTIAN SCHOOLS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 8160—**Charles P. Kocoras**, *Chief Judge.*

ARGUED NOVEMBER 26, 2001—DECIDED MARCH 14, 2003

No. 01-3400

OCEAN ATLANTIC CHICAGO CORPORATION,

*Plaintiff-Appellant,*

*v.*

DALE KONICEK, WAYNE KONICEK,
LOIS KONICEK, and ISENSTEIN-
PASQUINELLI, L.L.C.

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 00 C 5677—**James F. Holderman**, *Judge.*

_____

SUBMITTED JANUARY 23, 2002—DECIDED MARCH 14, 2003

_____

Before ROVNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* In these two cases, which we have consolidated for decision, the Ocean Atlantic Development Corporation and the Ocean Atlantic Chicago Corporation ("Ocean Atlantic") tendered letter offers to the owners of undeveloped land that Ocean Atlantic wished to purchase and the owners signed those offers. Each offer expressly anticipated that the parties would, in due course, sign a contract for the purchase and sale of the properties. As it turned out, however, the ensuing negotiations did not produce a final contract in either case. From the property owners' perspective, this meant that they had no obligation to sell their properties to Ocean Atlantic. But Ocean Atlantic, believing otherwise, filed suit, contending that the signed offers themselves constituted binding agreements that entitled the company to purchase the properties on the terms stated in those offers. In Ocean Atlantic's suit against Aurora Christian Schools ("Aurora Christian"), now-Chief Judge Kocoras granted summary judgment in favor of Aurora Christian, reasoning that the unambiguous language of the offer revealed no intent by the parties to be bound by its terms. Subsequently, in Ocean Atlantic's suit against Dale, Wayne, and Lois Konicek and Isenstein-Pasquinelli, L.L.C., Judge Holderman adopted Judge Kocoras's reasoning, likewise concluded that the offer did not amount to a binding agreement, and granted summary judgment in favor of the defendants on that basis. Because we

agree that in neither instance did the offer constitute a binding agreement to sell the land to Ocean Atlantic, we affirm.

## I.

A. Aurora Christian Schools

Ocean Atlantic is a real estate development company that is incorporated in Virginia and maintains its principal place of business in Alexandria, Virginia. Ocean Atlantic has purchased and developed land in DuPage, Kane, and Will Counties—three of the suburban "collar" counties that surround Chicago and Cook County.

In April 1999, Ocean Atlantic commenced discussions with Aurora Christian about purchasing land that Aurora Christian owned in Kane County near Aurora, Illinois. Aurora Christian is an Illinois not-for-profit corporation that provides Christian-oriented education to students in kindergarten through the twelfth grade. By letter offer dated June 9, 1999, Ocean Atlantic proposed to buy 116 acres of land from Aurora Christian at $35,000 per acre, for a total of $4,060,000. Aurora Christian App. A117.[1] Aurora Christian rejected the offer and, among

---

[1] Nearly all of the pertinent documents, transcripts, and other record evidence in these appeals have been collected in the separate appendices filed by Ocean Atlantic and Aurora Christian in No. 01-2239 and by Ocean Atlantic in No. 01-3400. For ease of reference, we shall for the most part cite the appendices themselves as needed. References to the consecutively paginated appendices filed by Ocean Atlantic and Aurora Christian in No. 01-2239 shall be indicated by "Aurora Christian App. A___," whereas references to the appendix filed by Ocean Atlantic in No. 01-3400 shall be indicated by "Konicek App. A___." The district judges' opinions, along with documents not included

(continued...)

other things, sought an increase in the per-acre purchase price as well as a decrease in the acreage to be sold. On August 2, Ocean Atlantic submitted a revised offer to purchase 78 acres of land from Aurora Christian at $42,000 per acre for a total of $3,276,000. Aurora Christian App. A125. Aurora Christian again rejected the offer, still demanding a higher price. Three days later, on August 5, Ocean Atlantic tendered yet another offer to Aurora Christian proposing a per-acre purchase price of $45,000, for a total of $3,510,000. Aurora Christian App. A131. Aurora Christian found the third offer to its liking and on August 6, 1999, Aurora Christian President Paul House signed the offer. Aurora Christian App. A134. Later that same day, Aurora Christian Treasurer Keith Gibson faxed a copy of the signed offer to Ocean Atlantic along with a cover letter stating that "your captioned letter offer has been accepted" and "we look forward to an excellent relationship." Aurora Christian App. A141.

The opening sentence of the August 5 offer that Aurora Christian signed indicated that "[t]his Letter Offer . . . will serve to set forth some of the parameters for an offer from Ocean Atlantic Development Corp." to purchase from Aurora Christian the 78 acres of land identified in the letter's caption and in an exhibit attached to the letter. Aurora Christian App. A131. The offer then proceeded to identify the following parameters:

> (1)    Ocean Atlantic would purchase the property at a per-acre price of $45,000 for a total of $3,510,000, subject to verification of the total acreage.

---

[1] (...continued)
in these appendices, shall be referenced by their record number designations. "Aurora Christian R.___" shall refer to opinions and documents in No. 01-2239, and "Konicek R.___" shall refer to opinions and documents in No. 01-3400.

(2)     Ocean Atlantic would pay for the land wholly in cash on the closing date.

(3)     The purchase of the land would be subject to a 90-day inspection period that would commence on the date that the parties signed a contract of purchase and sale. During that inspection period, Ocean Atlantic would have the right to enter the property in order to conduct soil, environmental, engineering, and other studies in order to determine whether the property was suitable for Ocean Atlantic's intended use.

(4)     Within five business days after the parties executed a contract of purchase and sale, Ocean Atlantic would deposit into escrow $25,000 in earnest money toward the purchase of the property. In the event that Ocean Atlantic decided to terminate the contract during the inspection period, the deposit would be returned to Ocean Atlantic. However, if Ocean Atlantic elected upon expiration of the inspection period to proceed with the acquisition of the property, it would increase the earnest money deposit to a total of $100,000. This deposit was to serve as "full and complete liquidated damages" to Aurora Christian in the event that Ocean Atlantic defaulted on any of its obligations under the contract of purchase and sale.

(5)     Upon satisfactory completion of the inspection period, Ocean Atlantic would have a six-month "entitlement period" in order to make arrangements with the appropriate municipal authorities for (a) rezoning and final plat approval for development of the property, (b) sufficient sanitary sewer and water capacity, and (c) necessary on- and off-site public improvements. The letter

provided for a 60-day extension of the entitlement period in the event that Ocean Atlantic had completed its applications for rezoning and final plat approval within six months but was still waiting for approval or denial by local authorities. Ocean Atlantic also had the right to purchase additional 30-day extensions of the entitlement period for $5,000 each if it was still awaiting approvals.

(6)    Closing of the purchase and sale was to occur within 30 days after Ocean Atlantic secured annexation, rezoning, and final plat approval for the property. Title to the property "shall be marketable and good of record and in fact and insurable as such at ordinary rates by a recognized title insurer free and clear of all liens and encumbrances or unacceptable exceptions."

(7)    Ocean Atlantic had the right of first refusal with respect to the purchase of two additional, adjacent parcels of Aurora Christian property identified in the exhibit to the letter.

(8)    Aurora Christian represented that it "will not further encumber the Property or negotiate, or agree to, its sale," that it would make no commitments or representations to other property owners or governmental authorities that would bind Ocean Atlantic or interfere with its ability to develop the property, and that it had no notice of any pending or threatened litigation, petition, proceeding or zoning application that would interfere with Ocean Atlantic's development plans.

(9)    Ocean Atlantic and Aurora Christian warranted to one another that neither had a deal with any agent, broker, or finder other than the two brokers identified in the letter. Aurora Christian

would pay a commission to those two brokers by separate agreement upon closing.

(10)   "Upon such acceptance and return of this Offer, Purchaser shall prepare and present to the Seller a Contract of Purchase and Sale in accordance with the terms and provisions hereof. Purchaser and Seller shall work diligently to execute the Contract within Thirty (30) days of the execution of this Offer."

(11)   The offer would become "null and void" if not executed by both Ocean Atlantic and Aurora Christian within 10 days.

Aurora Christian App. A131-34. Because it is the August 5 offer that Ocean Atlantic contends amounts to a binding agreement for the purchase and sale of Aurora Christian's property, we have reproduced the full text of the letter at Appendix A to this opinion.

After Aurora Christian signed the offer, Ocean Atlantic set to work drafting a contract for the purchase and sale of the land as called for in the offer. On August 25, 1999, Ocean Atlantic tendered a proposed contract to Aurora Christian, but the discussion and drafting process continued as the parties attempted to resolve outstanding issues. Aurora Christian App. A148. On October 29, Ocean Atlantic transmitted a final revised draft of the proposed contract to Aurora Christian. Aurora Christian App. A168. The terms of that draft were for the most part consistent with the parameters identified in the August 5, 1999 letter, but the draft contract also spelled out the terms of the purchase and sale in considerably greater detail. For example, the draft contract disclosed that it was Ocean Atlantic's intent to develop 30 acres of town-homes and 45 acres of single-family homes on the property and called for the parties to jointly prepare a master plan reflecting that and all other intended uses for the

property. Aurora Christian App. A172-73 ¶ 5(a). Provisions were made for the examination and transfer of title to the property. Aurora Christian App. A176-78 ¶ 7. Ocean Atlantic and Aurora Christian each made a number of representations, warranties, and covenants not included in the offer. Aurora Christian App. A180-83 ¶¶ 10, 11. Additional provisions also were included for the allocation of closing costs, compliance with governmental orders, defaults by either Ocean Atlantic or Aurora Christian, the possibility of condemnation, notices between the parties, and some 16 other miscellaneous topics. Aurora Christian App. A183-91 ¶¶ 14-17, 19, 21, 23. And in at least one respect, the terms of the draft contract also departed from those of the offer. Whereas the offer provided that upon expiration of the 90-day inspection period, the increased earnest money deposit of $100,000 would become non-refundable (Aurora Christian App. A132 ¶ 4(b)), the October contract created an exception allowing a refund of the $100,000 to Ocean Atlantic in the event that Ocean Atlantic extended the entitlement period but failed to obtain annexation and final plat approval from local authorities and on that basis decided to terminate the contract. Aurora Christian App. A176 ¶ 6.2. Ultimately, Aurora Christian refused to sign the contract.

On December 15, 1999, Ocean Atlantic filed a verified complaint against Aurora Christian in the district court invoking the court's diversity jurisdiction. Aurora Christian App. A14. Ocean Atlantic asserted that the signed August 5 offer "unambiguously contains all of the elements of the terms of parties' bargain" (Aurora Christian App. A16 ¶ 8) and as such constituted a binding agreement for the purchase and sale of Aurora Christian's property. Aurora Christian had breached that agreement, according to Ocean Atlantic, by failing to make a good faith effort to arrive at a final contract of purchase and

sale and by refusing to execute that contract even after all apparent points of disagreement between the parties had been resolved. Aurora Christian App. A19 ¶ 19. By way of relief, Ocean Atlantic asked the district court to enter (1) a declaratory judgment holding the August 5 offer to constitute a valid and binding contract for the purchase and sale of the property, (2) a judgment of specific performance requiring Aurora Christian to fulfill its obligations under the August 5 offer by, inter alia, finalizing and executing a final contract for the purchase and sale of the property, (3) preliminary and permanent injunctive that would bring an end to Aurora Christian's refusal to execute a final contract and that would prohibit Aurora Christian from selling or taking other steps with respect to the property that might prevent it from honoring its purported obligations under the August 5 offer, and (4) alternatively, money damages for breach of contract in the event that equitable relief culminating in the sale of the land to Ocean Atlantic were not possible. Aurora Christian App. A19-23. The suit was assigned to Judge Kocoras.

Contending that the material facts were not in dispute, Ocean Atlantic subsequently filed a motion for partial summary judgment asserting that the August 5, 1999 offer amounted to a "binding, fully enforceable contract" (Aurora Christian App. A277) for the purchase and sale of Aurora Christian's property. Aurora Christian App. A268-78. Aurora Christian opposed the motion, contending that "the August 5 Letter was merely an offer to make an offer and the language of the Letter clearly demonstrates that the parties did not intend the August 5 Letter to be a binding enforceable contract . . . ." Aurora Christian App. A195. In addition to the language of the offer itself, Aurora Christian also cited the circumstances surrounding the parties' negotiations, including the conduct of the parties both prior to and after the Au-

gust 5 letter, as evidence that the parties did not intend to be bound by the offer. *See* Aurora Christian App. A199-203. Judge Kocoras subsequently denied Ocean Atlantic's motion in a written opinion. Aurora Christian R.17. In relevant part, that opinion stated:

> [W]e find that the Letter contains ambiguities that present a disputed fact precluding summary judgment. Specifically, we believe factual questions remain as to whether Aurora Christian intended to be bound by the Letter. The very first sentence of the Letter undermines Ocean Atlantic's contention that it was a definitive offer. That sentence reads, "This Letter Offer ('Offer') will serve to set forth *some of the parameters* for an offer from the Ocean Atlantic Development Corp. ('Purchaser') to purchase the above-referenced property . . . ." (Pl. Ex. B. at 1) (emphasis added). One could reasonably construe these words as indicating that Ocean Atlantic may have intended to put together a complete offer at some later time but stopped short of doing so in the Letter.

> In addition, the Letter appears to omit several critical items that one would expect to find in a definitive offer pertaining to a multi-million dollar land sale transaction. *See Chicago Investment Corp. v. Dolins*, 481 N.E.2d 712, 715-16 (Ill. 1985) (upholding trial court's conclusion that writing's omission of several items normally included in real estate contracts, as well as other factors, indicated that writing was unenforceable). The Letter does not broach the topic of a consummation date for the sale, nor does it refer to tax prorations or the form of conveyance. In addition, the Letter makes no prospective purchaser or seller warranties and only limited seller representations related to zoning. One would expect to find these terms set forth in a transaction of this magnitude. Like

the first sentence of the letter, these omissions raise factual questions as to whether Aurora Christian intended to be bound when its representative signed the Letter.

Aurora Christian R.17 at 4-5. At a hearing conducted on the day that he issued his written opinion, Judge Kocoras informed the parties' counsel that "you are facing a trial because I think the case deserves an elucidation of evidence, both whatever the writings were and anything that attends those writings, to decide whether you have a binding contract." Aurora Christian App. A57. "[T]he material facts are in dispute," he emphasized. Aurora Christian App. A58.

Several months later, after the parties had engaged in limited, written discovery, Aurora Christian itself asked the court to enter summary judgment, positing that, as a matter of law, the offer did not amount to a binding and enforceable contract. Aurora Christian App. A213.[2] In the first instance, Aurora Christian argued, the letter "omits or lacks certainty as to many material terms which are essential to a complex, multi-million dollar commercial real estate transaction." Aurora Christian App. A214. These included terms relating to the dates on which the sale would be consummated and Ocean Atlantic would take possession of the property, the proration of taxes, the form of conveyance to Ocean Atlantic, purchaser and seller warranties, forms of notice to the parties, and a guarantee title policy. Aurora Christian App. A216-22. Secondly, in Ocean Atlantic's view, the letter did not manifest an intent by the parties to be bound. The opening sentence of the letter, which noted

---

[2] Aurora Christian made a number of alternative arguments that we need not delve into here.

that it served "to set forth some of the parameters for an offer," suggested that it was merely an offer to make an offer rather than a binding agreement. Aurora Christian App. A225. At the same time, the letter called for the preparation of a formal contract of purchase and sale and tied the sale of the property to the execution of that contract. Aurora Christian App. A225-26. Subsequently prepared drafts of the formal contract, and the continuing negotiations attending those contracts, confirmed that the offer did not amount to a binding agreement. Aurora Christian App. A226-30.

Judge Kocoras granted Aurora Christian's motion, agreeing that "the collective or cumulative terms of the Letter frustrate any notion of enforceability." R.29 at 8. Most important in the judge's mind was that the terms of the letter rendered the agreement for the purchase and sale of the property contingent upon the execution of a formalized contract.

> Five provisions make this conclusion unambiguous. First, Ocean Atlantic furnished no earnest money at the time it submitted the Letter to Aurora Christian. Nor was earnest money due if Aurora Christian elected to sign the Letter. Rather, the earnest money was due only upon execution of the purchase contract. (Letter ¶ 4(a).) Second, the inspection period would ensue only after the purchase contract was executed. (*Id.* ¶ 3.) Third, because the six-month period during which Ocean Atlantic would seek local government approval for rezoning and final plat approval began upon completion of the inspection period, it too was contingent on the execution of a contract. (*Id.* ¶ 5.) Fourth, because inspection and local government approval were prerequisites to closing, the closing too was contingent upon the purchase contract. Fifth, the default provision referred only to Ocean Atlantic's

obligations under the anticipated purchase contract, not to any arising under the Letter. (*Id.* ¶ 4.)

R. 29 at 9. Furthermore, as the drafts of the never-executed contract revealed, the letter offer itself lacked a number of important terms that one would expect to find in an agreement governing a transaction of this magnitude, including a date for the consummation of the sale, provisions for tax proration and the form of conveyance, and warranties between the purchaser and seller. *Id.* at 10. Finally, the language found in the opening sentence of the letter "is the language of a preliminary negotiation tool, not a definitive offer." *Id.* at 10-11.

At a hearing called for the purpose of issuing his decision, Judge Kocoras explained why he had changed his mind about the ambiguity of the August 5, 1999 offer. Judge Kocoras indicated that after reviewing the parties' conduct—in particular, the subsequent drafting of a contract containing terms that the offer lacked—he revisited the language of the offer and concluded that "neither side ever intended this letter [offer] to be the final, definitive agreement[—]that what was going to follow was an elaborate document setting forth everything." Aurora Christian App. A115; *see also id.* at A114-15. Contrary to his initial impression, then, he concluded that the offer was not ambiguous. Based on the terms of the offer itself, and in light of events that followed, he found the record to be clear that the parties did not mean for the offer to bind them. Aurora Christian App. A114.

B.  The Koniceks

Approximately one year after it first proposed to buy Aurora Christian's property, Ocean Atlantic commenced

negotiations with Dale, Wayne, and Lois Konicek[3] to purchase approximately 158 acres of farm land that they owned in Kendall County, Illinois. By letter offer dated April 20, 2000, Ocean Atlantic proposed to purchase the property for a total of $3,768,000, or $24,000 per acre. Konicek App. A39. That offer was not acceptable to the Koniceks and they did not sign the letter. On April 26, Ocean Atlantic submitted a revised offer which reflected a higher purchase price of $25,000 per acre, for a total of $3,925,000; this second offer also incorporated other modifications that the Koniceks had requested. Konicek App. A43. Again, however, the Koniceks declined the offer, demanding a higher purchase price as well as other changes to the offer. On May 4, 2000, Ocean Atlantic tendered a third offer. This one proposed a total purchase price of $3,976,200, or roughly $25,225 per acre[4]; other modifications were also incorporated in this offer at the Koniceks' request. Once again, however, the Koniceks held out for more money; their attorney also demanded the inclusion of provisions regarding insurance coverage and crop damage. On May 24, 2000, Ocean Atlantic tendered a fourth offer which upped the proposed per-acre price by $100 to $25,325, resulting in a total proposed purchase price of $3,992,233; the requested provisions for insurance coverage and crop damage were also included in this offer. Konicek App. A55. Apparently, the Koniceks were at last satisfied with these terms; they signed the offer one week later. Konicek App. A59, 61.

---

[3] Wayne and Lois Konicek are husband and wife. They held a 50 percent ownership interest in the property that Ocean Atlantic wishes to buy, and Dale Konicek, Wayne's brother, held the other 50 percent interest in the property.

[4] The offer itself indicates that Ocean Atlantic was offering to buy the Koniceks' property at a price of $25,325 per acre. Konicek App. A49 ¶ 1. However, the total proposed purchase price of $3,976,200 corresponds to a per-acre price of just under $25,225.

Because Ocean Atlantic apparently employed a form document for its offers, the terms of its May 24, 2000 offer to the Koniceks were identical in many respects to the August 5, 1999 offer that Ocean Atlantic made to Aurora Christian. Thus, the opening sentence of the May 24 offer states that "[t]his Letter Offer . . . will serve to set forth some of the parameters for an offer from Ocean Atlantic Chicago Corp." to purchase the Koniceks' land. The letter went on to identify the following parameters:

(1)     Ocean Atlantic would purchase the property for a total of $3,992,233, subject to verification of the total acreage and based upon a purchase price of $25,325 per acre.

(2)     Ocean Atlantic would pay for the land wholly in cash on the closing date.

(3)     The purchase of the land would be subject to a 90-day inspection period that would commence on the date that the parties signed a contract of purchase and sale. During that inspection period, Ocean Atlantic would have the right to enter the property in order to conduct soil, environmental, engineering, and other studies in order to determine whether the property was suitable for Ocean Atlantic's intended use.

(4)     Within five business days after the parties executed a contract of purchase and sale, Ocean Atlantic would deposit into escrow $50,000 in earnest money toward the purchase of the property. In the event that Ocean Atlantic decided to terminate the contract during the inspection period, the deposit would be returned to Ocean Atlantic. However, if Ocean Atlantic elected upon expiration of the inspection period to proceed with the acquisition of the property, it would increase

the earnest money deposit to a non-refundable total of $100,000 and instruct the escrow agent to release $50,000 of the deposit to the Koniceks. The $100,000 deposit was to serve as "full and complete liquidated damages" to Aurora Christian in the event that Ocean Atlantic defaulted on any of its obligations under the contract of purchase and sale.

(5)   Upon satisfactory completion of the inspection period, Ocean Atlantic would have a six-month "entitlement period" in which to make arrangements with the appropriate municipal authorities for (a) rezoning and final plat approval for development of the property, (b) sufficient sanitary sewer and water capacity, and (c) necessary on- and off-site public improvements. The letter provided for a 60-day extension of the entitlement period in the event that Ocean Atlantic had completed its applications for rezoning and final plat approval within six months but was still waiting for approval or denial by local authorities. Ocean Atlantic also had the right to purchase additional 30-day extensions of the entitlement period for $5,000 each if it was still awaiting approval.

(6)   Closing of the purchase and sale was to occur within 30 days after Ocean Atlantic secured annexation, rezoning, and final plat approval for the property. Title to the property "shall be marketable and good of record and in fact and insurable as such at ordinary rates by a recognized title insurer free and clear of all liens and encumbrances or unacceptable exceptions."

(7)   The Koniceks represented that they "[would] not further encumber the Property or negotiate, or

agree to its sale," that they would make no commitments or representations to other property owners or governmental authorities that would bind Ocean Atlantic or interfere with its ability to develop the property, and that they had no notice of any pending or threatened litigation, petition, proceeding or zoning application that would interfere with Ocean Atlantic's development plans; and that they, along with Ocean Atlantic, would keep the terms of the offer confidential.

(8)     Ocean Atlantic and the Koniceks warranted to one another that they had not dealt with any agent, broker, or finder other than the two individuals identified in the letter. Ocean Atlantic would pay a commission to those two persons by separate agreement upon closing.

(9)     Ocean Atlantic, before initiating ingress or egress to the property, would obtain liability insurance in the amount of $1 million naming the Koniceks as additional insured parties. The Koniceks, in turn, would provide evidence of their own liability coverage to Ocean Atlantic.

(10)    In the event that the crops on the land were damaged during inspection, Ocean Atlantic would reimburse the Koniceks at a rate of $350 per acre, with the affected acreage to be determined by an independent surveyor.

(11)    Ocean Atlantic agreed to cooperate with the Koniceks to effect a "Like-Kind Exchange" as defined by section 1031 of the Internal Revenue Code, with the costs associated with that exchange to be borne by the Koniceks.

(12)    "Upon such acceptance and return of this Offer, Purchaser shall prepare and present to the

> Sellers a Contract of Purchase and Sale in ac-
> cordance with the terms and provisions hereof."

(13)   The offer would become "null and void" if not ex-
ecuted by both Ocean Atlantic and the Koniceks
within 5 days.

Konicek App. A55-59. Because it is the May 24 offer that
in Ocean Atlantic's view amounts to a binding agreement
for the purchase and sale of the Koniceks' property, we
have reproduced the full text of the letter at Appendix B
to this opinion.

In a cover letter to Ocean Atlantic's broker enclosing
the signed offer, the Koniceks' attorney, Louis Neuendorf,
wrote that "[t]he inspection period, per the letter [offer],
commences from the date of the letter to-wit, May 31,
2000, and extends for a period of 90 days from said date,
or to August 31, 2000." Konicek App. A61. Neuendorf
also enclosed evidence of the Koniceks' current liability
coverage. Konicek App. A62.

After the Koniceks signed the May 24 letter, Ocean
Atlantic set about drafting a contract for the purchase
and sale of the land. On or about June 21, 2000, Ocean
Atlantic's attorney, Kevin Gensler, forwarded a first
draft of the contract to the Koniceks. Konicek App. A64.
On July 12, 2000, Neuendorf, on the Koniceks' behalf,
wrote a four-page letter to Gensler requesting some 20
revisions to the terms of the proposed contract. Konicek
App. A83. Gensler modified the proposed contract in
response to Neuendorf's suggestions and returned a re-
vised draft to Neuendorf on or about August 2, 2000.
Konicek App. A87.

However, soon after the modified draft was sent to the
Koniceks' attorney, the Koniceks received another offer
to purchase their property from Isenstein-Pasquinelli,
L.L.C., an Illinois corporation based in south-suburban
Chicago. On August 8, 2000, Neuendorf informed Gensler

by letter that the Koniceks had received another offer for their land that exceeded by more than $500,000 Ocean Atlantic's proposed purchase price. Konicek App. A108. After outlining the other terms of the offer, Neuendorf advised Gensler that if Ocean Atlantic "[would] enter into a contract with the same terms and conditions as the proposed contract of the other Purchaser, the Koniceks would proceed to sell the property to your client." Konicek App. A108-09. One week later, Gensler wrote back to Neuendorf rejecting the Koniceks' invitation to sweeten Ocean Atlantic's offer:

> The purchase price has been agreed upon by the parties in the May 24, 2000 letter agreement. Ocean Atlantic Chicago Corp. expects the Koniceks to negotiate in good faith and in compliance with the letter agreement executed between all the parties. Paragraph 7A of the Agreement specifies that the Sellers will not further [e]ncumber or negotiate for the sale of the subject property. Please issue comments as to the latest draft of the agreement submitted for your review.

Konicek App. A115. On the following day, August 16, 2000, Neuendorf faxed a letter back to Gensler rejecting the notion that the May 24 offer constituted a binding agreement between the parties. Neuendorf wrote:

> I do not consider a letter containing statements such as "this letter will serve to set forth *some* of the *parameters for an offer* from Ocean Atlantic," or that "purchaser and sellers agree to keep the terms and conditions, and *all negotiations* regarding this letter offer confidential" to result in a binding agreement to sell and purchase real estate.

Konicek App. A116 (emphasis in original). Neuendorf also averred in the letter that when he had received the May 24 offer, he had suggested to Gensler that rather than having the Koniceks execute a letter of intent to

sell the property, the parties should simply proceed directly to the preparation and execution of a real estate contract. *Id.* But according to Neuendorf, Gensler had insisted on having a signed letter of intent before he would prepare a draft of the contract. *Id.* Gensler, who claims never to have spoken with Neuendorf, denies that this exchange ever took place. Konicek App. A130 ¶ 5, A131 ¶ 8.

Neuendorf reiterated that the Koniceks were prepared to proceed with the sale to Ocean Atlantic provided that Ocean Atlantic was prepared to match the terms of the competing offer they had received, Konicek App. A116-17, but Ocean Atlantic, believing that it had already had a deal with the Koniceks, declined. Talks between the parties came to an end, and Ocean Atlantic and the Koniceks never executed the contract for the purchase and sale of the Koniceks' property that the May 24 offer envisioned.

Lured by the more attractive offer, the Koniceks agreed to sell their property to Isenstein-Pasquinelli. On August 21, 2000, the Koniceks and Isenstein-Pasquinelli executed both a real estate sales contract and a rider to that contract. Konicek App. A124. Isenstein-Pasquinelli was aware that the Koniceks had signed Ocean Atlantic's May 24 offer; and both parties anticipated that Ocean Atlantic might file suit to enforce that offer. An addendum to the sales agreement and rider, also executed on August 21, provided:

> The Seller [sic] has advised Purchaser that a letter of intent was entered into with Ocean Atlantic but no contract was ever executed, and that Seller has legal right to enter this contract with Purchaser.

> If Ocean Atlantic should sue seller then Purchaser shall defend said lawsuit and pay costs of said defense but shall not be responsible if there are damages assessed against Seller. In the event such lawsuit is

> filed prior to time of closing then the time of closing shall be extended to a date thirty days after final adjudication of said lawsuit.

Konicek App. A128.

Ocean Atlantic filed suit against the Koniceks on September 15, 2000, seeking the same relief as to its May 24, 2000 offer to the Koniceks that it sought with respect to the August 5, 1999 offer to Aurora Christian. The case was assigned to Judge Holderman. Citing its contract to purchase the property from the Koniceks, Isenstein-Pasquinelli sought and obtained leave to intervene in the suit. Ocean Atlantic subsequently amended its complaint to include claims against Isenstein-Pasquinelli for tortious interference with contract and tortious interference with prospective economic advantage. Konicek R.14. Isenstein-Pasquinelli promptly moved to dismiss those claims, as well as all of the claims against the Koniceks, arguing that the May 24 offer on its face did not constitute an enforceable contract. Konicek App. A248. Although Judge Holderman dismissed the claim against Isenstein-Pasquinelli for tortious interference with prospective economic advantage, he denied the balance of the motion to dismiss, allowing the tortious interference with contract claim, along with all of the claims against the Koniceks, to stand. Konicek R.24, 34.

After the parties had conducted some amount of discovery, Isenstein-Pasquinelli, joined by the Koniceks, moved for summary judgment, in relevant part contending (again) that the May 24 offer was not an enforceable contract. Konicek App. A264. Among other authorities, they relied on Judge Kocoras's summary judgment ruling in favor of Aurora Christian, arguing that because the terms of the offer between the Koniceks and Ocean Atlantic did not materially differ from the terms of the offer between Aurora Christian and Ocean Atlantic, Judge

Holderman should likewise conclude that the May 24 offer was not enforceable. After receiving Ocean Atlantic's response to the motion, Judge Holderman granted the motion in an oral ruling:

> I have had an opportunity to review Ocean Atlantic's response to the defendants' motion for summary judgment and have reviewed carefully Judge Kocoras' decision in the *Ocean Atlantic versus Aurora Christian Schools*, and it seems to me that the distinctions between the two contracts are really not material.

> The fact that this land that these parties were involved with was crop land and had provisions for crop damage and insurance coverage really does not materially change the impact of the language.

> Plus, I have reviewed the deposition testimony, and it seems to me, looking at the intent of the parties as well as the language and substance of the letter agreement, that the deal was entirely contingent upon the execution of a purchase contract.

> I agree with Judge Kocoras' analysis. Basically, that analysis could be laid on all fours with the facts here subject to those immaterial distinctions. Consequently, applying the analysis that Judge Kocoras used in the *Aurora Christian Schools* case, which deal with the same contract, somewhat in the same area, it seems to me that there was no contract between the parties in the letter agreement, that the letter agreement did contemplate a further contract being entered into which never was. And so, consequently, the defendants' motion for summary judgment will be granted here from the bench, adopting all of Judge Kocoras' analysis and with the minor distinctions that I have commented on here.

Konicek R.74 at 2-3. In response to follow-up questions and argument from Ocean Atlantic's counsel, Judge Hold-

erman made two additional observations. First, although the parties had engaged in discovery and the judge had reviewed the deposition testimony submitted in connection with the summary judgment motion, Judge Holderman was relying on the language of the May 24 offer itself to conclude that the letter did not amount to a binding contract. Konicek R.74 at 5. Second, although there was deposition testimony suggesting that the parties believed some terms of the May 24 offer—in particular, those governing the inspection of the property and any crop damage that might result from such inspection—would take effect before a sales contract was negotiated and finalized, the judge did not believe that this extrinsic evidence raised a question of fact as to whether or not the parties had a binding contract for the purchase and sale of the property. Konicek R.74 at 7. Even if the parties had a binding agreement with respect to such matters as crop damage that might result from an inspection of the property, the judge reasoned, that did not establish that they had reached an agreement as to the purchase and sale of the property. *Id.* at 9-10.

## II.

In granting summary judgment in favor of the sellers, Judges Kocoras and Holderman each concluded that no reasonable finder of fact could conclude that the offer amounted to a binding contract between Ocean Atlantic and the sellers. We review the district judges' decisions de novo, construing the facts in a light favorable to Ocean Atlantic. *E.g., Stone v. Hamilton*, 308 F.3d 751, 754 (7th Cir. 2002).

## A.

The substantive law of Illinois governs the resolution of these diversity cases, as the parties agree. *See Erie*

*R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938); *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999). Illinois conditions the enforceability of a putative contract on two predicates: a sufficiently concrete expression of the essential terms of the agreement, as well as an intent to be bound by that agreement. *See Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991); *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 500 N.E.2d 1, 4-5 (Ill. 1986); *Morey v. Hoffman*, 145 N.E.2d 644, 647-48 (Ill. 1957); *IK Corp. v. One Fin. Place P'ship*, 558 N.E.2d 161, 169 (Ill. App. Ct. 1990). For the reasons that follow, we find, primarily from the face of each offer, that the parties did not intend for the offer to constitute a binding agreement for the purchase and sale of either property.

As we recognized in *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 424 (7th Cir. 1989), it is a common commercial practice for two negotiating parties to sign a letter of intent or an agreement in principal, signaling that they have come to a tentative agreement on the general outlines of a deal without having nailed down all of the details. Not infrequently, the negotiations that follow the execution of this document break down, prompting the disappointed party to sue on the theory that the preliminary document is binding. *Id.* Whether in fact the writing reflects a binding agreement between the parties, we explained, turns not on what the parties subjectively believed, but on what they expressly manifested in their writing. *Id.* at 425. As we went on to hold, a letter of intent or a similar preliminary writing that reflects a tentative agreement contingent upon the successful completion of negotiations that are ongoing, does not amount to a contract that binds the parties. *Id.* at 425-26. *See also Murray v. Abt Assocs., Inc.*, 18 F.3d 1376, 1378-79 (7th Cir. 1994).

Again in *Abbott Labs.*, we emphasized that it is the parties' objective intent as revealed by what they wrote, that determines whether or not they had come to a binding agreement:

> Whether the parties had a "meeting of the minds" is determined not by their actual subjective intent, but by what they expressed to each other in their writings. Thus, the parties decide for themselves whether the results of preliminary negotiations bind them, and they do so through their words. *See Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) citing *Chicago Inv. Corp. v. Dolins*, 107 Ill.2d 120, 89 Ill. Dec. 869, 481 N.E.2d 712, 715 (1985).

164 F.3d at 387. *See also Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993); *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 926 (7th Cir. 1991). If the parties' written words "do not show a clear intent to be bound," then they will not be held to a preliminary agreement. *Abbott Labs.*, 164 F.3d at 388.

Thus, in deciding whether the offers at issue here constitute binding agreements for the purchase and sale of the two properties, our focus first and foremost is on what parties said in those offers. *Id.* at 387. If the terms of the offers unambiguously indicate that they were merely tentative agreements to agree, leaving material terms unresolved, then there was no binding contract and the district court in each case properly granted summary judgment in favor of the sellers. *E.g.*, *id.* If, on the other hand, the offers appear to include all terms essential to the deal and manifest the parties' mutual intent to be bound by those terms, or at the least are ambiguous in that respect, then whether or not a binding agreement exists is a question that must be resolved at trial. *See, e.g.*, *Magallanes Inv., Inc. v. Circuit Sys., Inc.*, 994 F.2d 1214, 1218-19 (7th Cir. 1993).

**B.**

One question that we must address at the outset is whether Ocean Atlantic's offer to the Koniceks is necessarily a nullity because the Koniceks did not sign it until the offer, by its own terms, had already expired. The offer specified that if not signed and returned to Ocean Atlantic within five days, it "shall be null and void." Konicek App. A59 ¶ 13. The offer was dated May 24, 2000, but the Koniceks did not sign it and return it to Ocean Atlantic until May 31, 2000—two days beyond the deadline for acceptance. *See id.* at A59. Isenstein-Pasquinelli and the Koniceks assert that this alone renders the offer unenforceable. *See Waterman v. Banks*, 144 U.S. 394, 402, 12 S. Ct. 646, 648 (1892) ("There can be no question but that when an offer is made for a time limited in the offer itself, no acceptance afterwards will make it binding.") (internal quotation marks and citation omitted); *Fisher Iron & Steel Co. v. Elgin, Joliet & E. Ry. Co.*, 101 F.2d 373, 374-75 (7ᵗʰ Cir. 1939); *Johnson v. Whitney Metal Tool Co.*, 96 N.E.2d 372, 377 (Ill. App. Ct. 1951). But as Ocean Atlantic aptly points out, a provision of this sort serves to protect the offeror, and the offeror may, should it so choose, elect to waive strict compliance with the time limit. *See* WILLISTON ON CONTRACTS § 5.5, at 656 (4ᵗʰ ed. 1990). Here it would appear that notwithstanding the Koniceks' failure to sign and return the offer within the time provided, Ocean Atlantic was nonetheless prepared to overlook their tardiness and proceed with the preparation of a contract. Under these circumstances, we cannot say, as a matter of law, that the offer was null and void simply because the Koniceks did not sign it in a timely fashion. We must instead look beyond the expiration provision to the other terms of each offer to determine whether the offer binds either the Koniceks or Aurora Christian.

## C.

In both cases, the opening language of the offer suggests strongly that the parties did not intend for the offer to constitute a binding agreement. Each of the offers states that it "will serve to set forth *some of the parameters* for an offer . . . ." (Emphasis supplied.) Aurora Christian App. A131; Konicek App. A55. As Judge Kocoras observed, "This is the language of a preliminary negotiation tool, not a definitive offer." Aurora Christian R.29 at 10-11. It is tentative language, suggestive of ongoing negotiations rather than a meeting of the minds: the term "parameters" suggests the establishment of negotiating boundaries rather than final terms, and use of the word "some" suggests that any number of terms—including perhaps material terms—remained subject to negotiation. *Cf. Abbott Labs.*, 164 F.3d at 388 (letter from party that reiterated "general terms" of proposal then on table, and attempting to identify "essential terms" from that party's perspective, gives rise to strong implication that letter author expected other party to counter with essential terms of its own); *Empro Mfg.*, 870 F.2d at 425 (letter's recitation that it contains the "general terms and conditions" implies that each side retained the right to make (and stand on) additional demands); *Chicago Inv. Corp. v. Dolins*, 481 N.E.2d 712, 716 (Ill. 1985) (fact that document was entitled "Letter of Intent" "suggests preliminary negotiations, as opposed to a final and binding contract").

Consistent with the proposition that negotiations were ongoing, and that the parties had not yet committed themselves to the purchase and sale of the property, is the express anticipation in each offer that a contract of purchase and sale would be executed. Aurora Christian App. A134 ¶ 10; Konicek App. A59 ¶ 12. It is true, as we recognized in *Abbott Labs.*, that "anticipation of a more formal future writing does not nullify an otherwise

binding agreement," 164 F.3d at 388, citing *Dawson v. General Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992); *see also Magallanes Inv.*, 994 F.2d at 1218-19; *Empro Mfg.*, 870 F.2d at 425. Nonetheless, when the parties make clear that their mutual obligations are dependent upon the execution of a final contract, their preliminary writing will not be deemed a binding agreement. *See Venture Assocs.*, 987 F.2d at 432-33; *IK*, 558 N.E.2d at 166; *Interway, Inc. v. Alagna*, 407 N.E.2d 615, 618 (Ill. App. Ct. 1980). In this case, the parties' announced intent to prepare a contract serves to confirm that the offer itself did not constitute a binding agreement for the purchase and sale of the property.

Notably, under the terms of each offer, several key obligations and events with respect to the anticipated sale of the property, beginning with the inspection period, were to be triggered by the execution of the anticipated contract, rather than by the offer itself. The period during which Ocean Atlantic was to inspect each property and confirm that it was fit for the company's purposes did not begin to run until the contract for purchase and sale of the property had been signed. Aurora Christian App. A131 ¶ 3; Konicek App. A55-56 ¶ 3.[5] Ocean Atlantic notes that counsel for the Koniceks understood that the inspection period would start once the offer itself had

---

[5] With respect to the Aurora Christian purchase, the never-executed draft contract also provided that within 60 days of signing the contract, the parties would jointly prepare a master development plan for the property. That plan would provide not only for the townhouses and single family homes that Ocean Atlantic intended to construct on the purchased property, but also for ingress and egress through Aurora Christian's remaining adjacent properties and for Aurora Christian's intended use of those properties. *See* Aurora Christian App. A172-73.

been signed. *See* Konicek App. A61 (May 31, 2000 letter to Ocean Atlantic's broker from Konicek's counsel, asserting that 90-day inspection period commenced upon Koniceks' execution of offer). But that understanding is contrary to the plain terms of the offer itself—the offer states unequivocally that the inspection period would "commenc[e] upon the date that a Contract of Purchase and Sale ("Contract") has been executed by the parties hereto . . . ." Konicek App. A55 ¶ 3; *see also* Aurora Christian App. A131 ¶ 3.

Several other important obligations were in turn dependent upon the running of the inspection period. Only "[u]pon the expiration of the Inspection Period and election of Purchaser to proceed with the acquisition of the Property" did Ocean Atlantic's deposit of earnest money become non-refundable. Aurora Christian App. A132 ¶ 4(b); Konicek App. A56 ¶ 4(b).[6] Indeed, the terms of the offer indicate that only a default by Ocean Atlantic under the *contract*, as opposed to the offer, would be compensable by a forfeiture of that earnest money. *See* Aurora Christian App. A132 ¶ 4 (last grammatical paragraph); Konicek App. A56 ¶ 4 (last grammatical paragraph). Moreover, not until the inspection period was "successfully" completed did the six-month entitlement period for Ocean Atlantic to obtain approvals and commitments as to such matters as the property's zoning, sewer and water capacity, and on- and off-site public improvements begin. Aurora Christian App. A132 ¶ 5; Konicek App. A56 ¶ 5. In turn, not until those government approvals had been obtained would the closing on the purchase and sale occur. Aurora Christian App. A133 ¶ 6(a); Konicek App. A57 ¶ 6(a).

---

[6] At the same time, Ocean Atlantic became obligated to increase the amount of the earnest money deposit upon completion of the inspection period. Aurora Christian App. A26 ¶ 4(b); Konicek App. A56 ¶ 4(b).

Indeed, prior to the execution of a contract for the purchase and sale of the property, Ocean Atlantic had an unqualified right to walk away from the deal at no cost to itself. The offers imposed no obligation upon Ocean Atlantic to make a deposit of earnest money until a contract was signed; once a contract had been executed, Ocean Atlantic had five business days to make the initial, refundable deposit of earnest money. Aurora Christian App. A132 ¶ 4(a); Konicek App. A56 ¶ 4(a). Even then, the deposit remained fully refundable to Ocean Atlantic pending the completion of the 90-day inspection period which, as we have noted, would not begin until the contract had been signed. *See* Aurora Christian App. A132 ¶ 4(a) ("In the event that Purchaser elects to terminate the contract during the inspection period, the deposit shall be returned to the Purchaser by the escrow agent."); Konicek App. A56 ¶ 4(a) (same).[7] It was, therefore, the execution of the contract that would initiate the sequence of events by which Ocean Atlantic would incur a binding obligation to purchase the two properties.

True enough, as Ocean Atlantic is at pains to point out, neither of the offers contains a "subject to" clause explicitly stating that the parties' prospective agreement was conditioned upon the execution of a contract and/or that the offer itself was not binding. Such clauses are

---

[7] Our point is not that there could be no binding agreement between Ocean Atlantic and the sellers without a deposit of earnest money. *See Magallanes Inv.*, 994 F.2d at 1218. Rather, the fact that Ocean Atlantic was not obligated to make such a deposit until a contract had been signed, against the backdrop of an offer that tied other key events and processes to the execution of a contract, is yet one more signal that the parties intended for the contract, rather than the offer, to bind them. *See Berco Invs., Inc. v. Earle M. Jorgensen Co.*, 861 F. Supp. 705, 707 (N.D. Ill. 1994).

often found in letters of intent and the like, and the cases occasionally cite them as the "clincher" (to use Judge Kocoras' word) in finding that preliminary agreements lack binding force. Aurora Christian R.29 at 8; *see, e.g.*, *Venture Assocs.*, 987 F.2d at 432-33; *Berco Invs., Inc. v. Earle M. Jorgensen Co.*, 861 F. Supp. 705, 708 (N.D. Ill. 1994); *IK*, 558 N.E.2d at 167; *Interway*, 407 N.E.2d at 619-20. However, just as language anticipating the execution of a final contract does not rule out the possibility that the parties intended for their preliminary writing to bind them, *see Magallanes Inv.*, 994 F.2d at 1218-19; *Empro Mfg.*, 870 F.2d at 425, neither does the absence of a "subject to" clause carry talismanic significance. The parties may through other means make clear that they do not intend to be bound until a contract is executed. *See Abbott Labs.*, 164 F.3d at 388-39. In this case, by making such key events as the inspection period dependent upon the subsequent execution of a contract for the purchase and sale of the properties, Ocean Atlantic and the sellers made clear that the offers were not to have binding force.

The terms of the offers are therefore inconsistent with the proposition that Ocean Atlantic and the sellers had reached final agreements. By tying material obligations vis à vis the purchase and sale to the subsequent execution of a contract, the offers suggest that the putative agreements were tentative and inchoate. As we recognized in *Empro*, contracting parties can and often do approach agreement by stages, 870 F.2d at 426, and here the offers on their face bespeak an agreement to come to terms at a later date rather than a binding agreement to sell the two properties to Ocean Atlantic.

### D.

At the same time, and as Judge Kocoras pointed out, the offers omit terms one would expect to find in a multi-million

dollar contract for the sale of real property. Aurora Christian R.29 at 10. Without undertaking to identify all such terms or to rank their relative importance, we cite several examples that strike us as potentially significant. First, the offers standing alone do not establish a closing date for the consummation of either sale; on the contrary, under the express terms of the offers, a closing could not occur without the execution of a contract. As we have noted, the closing date was contingent in each case upon a number of other events: the successful completion of the six-month period for obtaining local government approvals as to zoning and other matters, which in turn was dependent upon the successful completion of the 90-day inspection period (and Ocean Atlantic's election to proceed with the acquisition), which in turn was dependent upon the execution of a contract for the purchase and sale of the property. Second, the offers contain no warranties on behalf of Ocean Atlantic or the sellers; only limited seller representations with respect to the current zoning status of the properties are included. *See* Aurora Christian App. A134 ¶ 8(c); Konicek App. A58 ¶ 7(c). Third, beyond stating that "[t]itle to the Property at Closing shall be marketable and good of record and in fact," Aurora Christian App. A133 ¶ 6(a)(ii); Konicek App. A57 ¶ 6(a)(ii), the offers do not make the typical provisions for conveyance of either property, including the form in which title was to be conveyed, title insurance, a title commitment, or which party was to pay the costs of curing any defects in the title. Fourth, neither offer makes any mention of taxes on the property or as to how responsibility for those taxes might be assigned. Fifth, the offers make no provision for the forms of notice to be used by the parties. Given the sums of money involved, the significant periods of time that the offers provided for the inspection of the properties and the solicitation of government approvals, Ocean Atlantic's right to extend the entitlement period, and Ocean Atlantic's right to back out of the pur-

chases in the event that the inspection period or the entitlement period did not yield satisfactory results, one would expect a binding agreement to spell out the means by which the parties were to notify one another of contractually significant events.

We note that these were all subjects that were addressed in the draft contracts that Ocean Atlantic prepared. Although the contracts left a closing date contingent upon successful completion in turn of the inspection and government approval periods, upon execution the contracts would have made the timing and probability of a closing more ascertainable by causing these two periods, in turn, to commence. *See* Aurora Christian App. A152 ¶ 5 ("The acquisition of the Property by the Purchaser shall be subject to a feasibility period ("Study Period") . . . commencing upon the Contract Effective Date and shall expire ninety (90) days after the date of the contract."), *id.* at A173 ¶ 5(b) (same); Konicek App. A67 ¶ 5 (same); *id.* at A90 ¶ 5 (same). Moreover, the draft contracts for the purchase of the Koniceks' property gave both parties the right to opt out of the transaction if the closing had not occurred within one year of the contract's effective date, a provision that provides a much firmer sense of how long the parties were willing to wait for closing to occur. Konicek App. A71 ¶ 8 (last grammatical paragraph), *id.* at A94-95 ¶ 8 (last grammatical paragraph). Buyer and seller warranties were set forth at length. Aurora Christian App. A157-60 ¶¶ 10, 11; *id.* at A180-83 ¶¶ 10, 11; Konicek App. A72-75 ¶¶ 10, 11; *id.* at A95-98 ¶¶ 10, 11. A title report was to be prepared and provided to Ocean Atlantic following execution of the contract, and at closing, title (in the same form and condition as during the inspection or "Study" period) was to be conveyed by "the usual Warranty Deed, with convenant of further assurances and the right to convey." Aurora Christian App. A154-55 ¶ 7, A156 ¶ 8(e), A157 ¶ 9; *id.* at A176-77 ¶ 7, A179 ¶¶ 8(e)

& 9; Konicek App. A68-70 ¶ 7, A71 ¶ 8(f), A72 ¶ 9; *id.* at A91-93 ¶ 7, A94 ¶ 8(f), A95 ¶ 9. Real estate taxes were to remain the responsibility of the sellers until the closing date, at which time the taxes would be adjusted pro rata and Ocean Atlantic would assume responsibility for them. Ocean Atlantic App. A158 ¶ 10(f), A160 ¶ 14; *id.* at A181 ¶ 10(f), A184 ¶ 14; Konicek App. A73 ¶ 10(g), A75 ¶ 14; *id.* at A96 ¶ 10(g), A98-99 ¶ 14. Finally, notices between the parties were to be conveyed to specified individuals and addresses by means of hand delivery, Federal Express or an equivalent courier, or by first class mail with return receipt requested. Aurora Christian App. A163-64 ¶ 21; *id.* at A187-88 ¶ 21; Konicek App. A78-79 ¶ 21; *id.* at A102-03 ¶ 21.

But are these terms material, such that the offers would be unenforceable without them, even if the parties meant for the signed offers to bind them? *See Academy Chicago Publishers v. Cheever*, *supra*, 578 N.E.2d at 983 ("[even if] the parties may have had and manifested the intent to make a contract, if the content of their agreement is unduly certain and indefinite, no contract is formed"). *Dolins*, 481 N.E.2d at 715-16, suggests that such terms *might be* material vis à vis the purchase and sale of real estate, but the opinion stops short of saying that they are inevitably material.[8] After a lengthy bench trial, the trial court in *Dolins* had concluded that a letter of intent regarding the purchase of real estate did not constitute a binding agreement, and among the circumstances that it cited in support of that determination was the omission

---

[8] *See also Morey v. Hoffman*, *supra*, 145 N.E.2d at 648 (no enforceable contract for the sale of apartment hotel building where parties had not yet resolved such matters as possession, inventory, interim management, and disposition of interim profits).

of the types of terms we have cited here. "While all of the foregoing omissions are not equally material," the Illinois Supreme Court observed in summarizing the lower court's holding, "the trial judge specifically found that cumulatively they were significant." *Id.* at 716. Without undertaking to endorse each aspect of the trial court's analysis, the state's high court concluded that the trial judge's ultimate determination that the parties had not entered into an enforceable contract, "was not against the manifest weight of the evidence." *Id.* As such, the court's opinion supplies scant support for the proposition that the omission of terms establishing a closing date, buyer and seller warranties, form of title, proration of taxes, and forms of notice render a real estate sales agreement unenforceable as a matter of law. For its part, Ocean Atlantic contends that these types of terms were of relatively minor importance here, and their omission would not prevent a court from enforcing the essential provisions spelled out in the offers, supplementing them as necessary by consulting terms customarily used in real estate transactions.

We need not, and do not, decide whether the omission of any of the terms we have discussed—singly or collectively—renders either of the two offers unenforceable. *See IK*, 558 N.E.2d at 169 ("even where essential terms have been agreed upon, if the clear intent of the parties is that neither will be bound until the execution and delivery of a written [contract], no contract exists until execution and delivery"). We do, however, take the opportunity to reiterate one point that has to do with the absence of a specified closing date from either of the offers. We agree with Ocean Atlantic that the omission of a date certain for closing would not necessarily be fatal to the enforceability of an agreement. Where, as here, the consummation of the contract is contingent upon the satisfactory completion of intermediate processes, the length and

outcome of which cannot be predicted in advance, it may well be impossible for the parties to name a particular date for closing. What they can do is identify the prerequisites to closing, specify the length of time that they will allow for those prerequisites to be satisfied, and so forth. That is what the parties did here. But, once again, the prerequisites that they identified in each offer make clear that the execution of a contract for the purchase and sale of the property was indispensable to consummation of the transactions: closing of each purchase and sale was contingent upon the successful completion of the entitlements period, which in turn was contingent upon the satisfactory completion of the inspection period, which in turn did not commence until the parties had executed the contract.

In sum, the express terms of the offers make plain that the parties did not intend for those offers to constitute binding agreements for the purchase and sale of the two properties. Key milestones in the progress toward consummation of each purchase and sale were made contingent upon the subsequent execution of a formal contract. Because the parties never executed such a contract, Ocean Atlantic lacks an enforceable right to purchase the properties.

## E.

Ocean Atlantic contends that the offers are, at the least, intrinsically ambiguous as to the parties' intent, thereby necessitating a trial at which the finder of fact could sort out those ambiguities. It notes, for example, that each offer contains all of the terms necessary (in its view) to enforce a contract for the purchase and sale of real estate—including the names of the purchaser and seller(s), the price, the central terms and conditions

of the sale, and a description of the property, *see Santo v. Santo*, 497 N.E.2d 492, 494 (Ill. App. Ct. 1986) (to be specifically enforceable, letter agreement for sale of land must contain essential terms such as these), citing *Inland Real Estate Corp. v. Christoph*, 437 N.E.2d 658, 661 (Ill. App. Ct. 1981)—and that the offers use the words "offer" and "acceptance," which are classic contractual terms that indicate a meeting of the minds, *see Magallanes Inv.*, 994 F.2d at 1219. It also points out that each offer contains a provision stating that it will be "null and void" unless "accepted" within a specified time. *See Inland Real Estate* at 660-61 (concluding that "null and void" clause gave rise to ambiguity as to parties' intent because it was consistent with intent to be bound). Aurora Christian and the Koniceks alike signaled their acceptance by signing and returning the offer to Ocean Atlantic (although, as discussed earlier, the Koniceks failed to do so within the specified time limit). Finally, Ocean Atlantic reiterates that neither offer contains a "subject to" clause indicating that the subsequent execution of a more comprehensive contract was essential to purchase and sale of the property. *See supra* at 30-31; *Magallanes Inv.*, 994 F.2d at 1218; *Evans, Inc. v. Tiffany*, 416 F. Supp. 224, 239 (N.D. Ill. 1976) (failure to include such a clause suggests intent to be bound). Each of these circumstances suggests to Ocean Atlantic that the parties shared an intent to be bound by the offer.

As the foregoing analysis makes plain, however, we discern no ambiguity in the offers vis à vis the parties' intent. The offers no doubt reveal that the parties had come to terms on "some of" the parameters for the purchase and sale of the two properties—perhaps even the most important terms. At the same time, the offers admittedly lack language making Ocean Atlantic's agreement to purchase the properties, and the owners' agreement to sell the land, contingent upon the execution of a final

contract. But by postponing until execution of such a contract the inspection and entitlement periods on which consummation of the two transactions hinged, the offers make plain that they did not represent definitive agreements between Ocean Atlantic and the sellers. The parties structured each of the transactions in such a way that preparation and execution of a more comprehensive contract was a signally important prerequisite to the ultimate purchase and sale of the land. By doing so, the parties made plain that they did not mean to be bound to the terms set forth in the offer.

**F.**

Ocean Atlantic also invites the court's attention to a series of circumstances beyond four corners of the offers themselves which it believes gives rise to an extrinsic ambiguity as to whether the offers were binding. It notes, in the first instance, that each offer was the product of months of negotiations with the prospective sellers. Indeed, in both cases, Ocean Atlantic submitted multiple offers, each reflecting revisions it made in response to the sellers' demands, before securing acceptance from Aurora Christian and the Koniceks: Aurora Christian had negotiated for both increases in the purchase price as well as a decrease in the acreage to be sold; and the Koniceks had asked for increases in the purchase price, the addition of provisions for crop damage and insurance coverage, and the addition of signature lines for Wayne and Lois Konicek (the original offer had named Dale Konicek alone as the property owner). The extent and substance of these interchanges suggest to Ocean Atlantic that the parties viewed the offer as the embodiment of their agreement and not just an interim summary of negotiations that were ongoing. Consistent with this view, Ocean Atlantic points to minutes from an Aurora Christian

board of directors meeting indicating that the board had chosen to pursue Ocean Atlantic's offer from among several it had received on its property, that the board weighed and rejected various changes it might ask Ocean Atlantic to make to the offer, and that it considered what effect its acceptance of Ocean Atlantic's offer would have on Aurora Christian's other development plans. *See* Aurora Christian App. A122-23. When Aurora Christian's president signed Ocean Atlantic's third offer, Aurora Christian's treasurer returned it to Ocean Atlantic with a note indicating that "your . . . letter offer has been accepted." Aurora Christian App. A141. Aurora Christian subsequently informed another bidder that it had reached an agreement with Ocean Atlantic. Aurora Christian App. A147. Each of these facts suggests to Ocean Atlantic that Aurora Christian understood and treated the accepted offer as a binding contract. In a like vein, Ocean Atlantic highlights testimony from the Koniceks to the effect that they wanted terms regarding insurance and crop damage included in the offer so that those provisions would be in place in the event that the inspection period began immediately upon acceptance of the offer. *See* Konicek App. A165 (deposition of Wayne Konicek), A151 (deposition of Dale Konicek). Indeed, when the Koniceks' attorney returned the signed offer to Ocean Atlantic, his cover letter indicated that "per the letter [offer]," the inspection period was to commence immediately, as of the date the offer was signed; he also enclosed proof of the Koniceks' liability insurance coverage. *See* Konicek App. A61. That understanding is, as we have noted, inconsistent with the terms of the offer itself, but Ocean Atlantic argues that the court is bound to consider it as proof that the offers are not as clear as they might at first blush appear. And, lest we view all of this evidence as insufficient to establish an extrinsic ambiguity in the offers, Ocean Atlantic contends that it should be given

the opportunity to engage in further discovery so that it might marshal additional evidence.

None of the evidence to which Ocean Atlantic has pointed us, however, constitutes admissible evidence of an extrinsic ambiguity in either offer. An extrinsic ambiguity is one that is not apparent from the face of a document, one that requires evidence from other sources to establish. *See*, *e.g.*, *United States v. Rand Motors*, 305 F.3d 770, 774-75 (7th Cir. 2002); *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999). Whereas we have construed the offers to constitute preliminary, non-binding writings that conditioned the purchase and sale of the properties upon the subsequent execution of more complete contracts, Ocean Atlantic points to extrinsic evidence of the kind we have just discussed as proof that the parties themselves believed that the offers bound them. But the general rule in Illinois is that only objective evidence supplied by disinterested third parties may establish an extrinsic ambiguity in a contract. *See AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir. 1995); *but see also Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1121 (7th Cir. 2002) (assuming that written admission by opposing party as to meaning of contract might constitute objective evidence of external ambiguity). Ocean Atlantic's proof, by contrast, focuses on the parties' own, subjective construction of the offers and whether or not they were binding. The evidence does not suggest that the terms of the offers carried a unique, contextual meaning not apparent from the face of each offer, nor does it give us reason to question what the offers plainly said. *See AM Int'l*, 44 F.3d at 575. As such, this evidence does not create doubt about the meaning of the offers, nor does it demonstrate a need for further discovery. Our focus remains within the four corners of the offers, and within those boundaries

we discern no ambiguity.[9]

## G.

Ocean Atlantic seizes upon Judge Holderman's observation that the Koniceks and Ocean Atlantic might have reached an agreement that was binding in certain respects—in particular, as to Ocean Atlantic's right to inspect the property and its liability for any crop damage resulting from the inspection—as yet another signal that the terms of the Konicek offer, at least, are ambiguous

---

[9] In both cases, Ocean Atlantic also notes that its practice has been to insist on a signed letter offer before it starts work on drafting a contract. Drafting a contract for the purchase of properties worth in excess of $1 million "is a time-consuming and costly process," its president notes. Aurora Christian App. A143 ¶ 9 (deposition of Michael Ferraguto, Jr.). Making sure by way of a signed offer that the parties are of one mind on the essential terms of the deal before they set to work on writing the contract "assures Ocean Atlantic that its time and financial investment [are] not wasted, particularly in an improving real estate market." Aurora Christian App. A144 ¶ 10; *see also* Konicek App. A131 ¶ 9 (affidavit of Kevin Gensler) ("[t]he purpose of such letter agreements is to bind the parties to the major business terms of the sale prior to expending money on legal and other fees to negotiate the minor details of the more formal contract"). Ocean Atlantic's desire to avoid wasting its time and resources negotiating a contract that a seller might or might not sign is understandable. Even so, the expenditures of time and money that Ocean Atlantic made in an effort to finalize agreements with Aurora Christian and the Koniceks are hardly so significant or unusual as to raise doubt about whether the parties intended for the offers to be binding. As we observed in *Empro Mfg.*, "[o]utlays of this sort cannot bind the other side any more than paying an expert to tell you whether the painting at the auction is a genuine Rembrandt compels the auctioneer to accept your bid." 870 F.2d at 426.

with respect to the parties' intent. We disagree. In a colloquy with Judge Holderman, Ocean Atlantic's counsel highlighted some of the extrinsic evidence that we have just finished discussing—specifically, that the Koniceks as well as their attorney had believed that an inspection of the property would or might take place before a contract for the purchase and sale of the property was finalized, and that provisions for such things as insurance and crop damage had been included in the offer to account for that possibility. *See* Konicek R.74 at 5-6. Judge Holderman observed that evidence of this sort was immaterial to a determination of whether the parties had reached a binding agreement for the purchase and sale of the property. *Id.* at 6. The most that it might show, if read favorably to Ocean Atlantic, was that the parties had agreed to proceed with an inspection before signing a contract; but an agreement to that limited extent did not, in the judge's view, suggest that the parties had also bound themselves to the purchase and sale of the property:

> Before someone purchases property, they usually want to inspect it, they want to evaluate it. If it was a car, you'd want to take it for a test-drive, but that doesn't mean you bought it.

*Id.* at 7. Notably, Judge Holderman did not find that the subjective understanding of the parties gave rise to any ambiguity in the offer itself, nor did he find that the offer actually permitted an inspection prior to the execution of a contract for the purchase and sale of the property. He was discussing what the extrinsic evidence, taken alone, might establish, not what the written offer itself—on which he based his ruling (*see id.* at 5)—actually provided. As our earlier discussion makes clear, the offer on its face makes plain that an inspection would not occur until the parties had first executed a contract, and that condition was never satisfied. The apparent belief of the Koniceks and their counsel that an inspection could

or would occur in the absence of the contract envisioned by the offer was flatly inconsistent with the offer itself.[10] And because evidence of this belief does not constitute proper evidence of an extrinsic ambiguity in the offer, it is the language of the offer on which we rest rather than the parties' private expectations and assumptions.

**H.**

In the *Aurora Christian* case, Judge Kocoras ultimately held that the terms of the offer between Ocean Atlantic and Aurora Christian unambiguously revealed the lack of an intent to be bound; for that reason, he entered summary judgment in favor of Aurora Christian. Earlier in the litigation, however, in denying Ocean Atlantic's own motion for partial summary judgment, the judge had described the offer as ambiguous vis à vis the parties' intent. Aurora Christian R.17 at 4-5. In view of that ruling, as well as arguments that Aurora Christian asserted (successfully) in opposition to Ocean Atlantic's request for summary judgment, Ocean Atlantic asserts that Aurora Christian was foreclosed from subsequently arguing, and Judge Kocoras was foreclosed from subsequently holding, that the offer was *un*ambiguous. In support of this contention, Ocean Atlantic relies on the doctrines of judicial estoppel, mend the hold, and law of the case.

---

[10] Of course, the parties might have elected to proceed with an inspection without first signing a contract as the offer specified. It is certainly not unusual for parties to depart from the terms of their writings in practice (although that is not what occurred here). The Koniceks' anticipation of that possibility does not undermine the offer's explicit requirement that the parties enter into a contract nor does it otherwise bestow binding force on the offer itself.

Ocean Atlantic forfeited these arguments by failing to assert them below, however. Its memorandum in opposition to Aurora Christian's summary judgment motion took passing note of the contentions that Aurora Christian had previously made and noted as well that the court had already deemed the offer to be ambiguous. *See* Aurora Christian App. A279-80, 290. But nowhere in the memorandum did Ocean Atlantic contend that the arguments Aurora Christian was asserting in support of its motion for summary judgment were barred by the doctrines of judicial estoppel or mend the hold, nor did Ocean Atlantic anywhere suggest that the law of the case doctrine bound Judge Kocoras to his own prior ruling. Although forfeited arguments typically remain subject to review for plain error in criminal cases, the plain error doctrine will rarely permit this court to reach forfeited arguments in civil litigation. *See, e.g.*, *McKinney v. Indiana Michigan Power Co.*, 113 F.3d 770, 774 (7th Cir. 1997). As there is no extraordinary circumstance warranting plain error review here, we do not address Ocean Atlantic's judicial estoppel, mend the hold, and law of the case theories.

## I.

In the *Konicek* litigation, Ocean Atlantic not only sought relief in contract from the Koniceks, but relief on the theory of tortious interference with contract from Isenstein-Pasquinelli. To prevail against Isenstein-Pasquinelli, Ocean Atlantic would have to prove that there was, in fact, a binding agreement between the Koniceks and Ocean Atlantic for the purchase and sale of the property. *See, e.g.*, *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997); *Stafford v. Puro*, 63 F.3d 1436, 1441 (7th Cir. 1995). We have concluded otherwise, of course, and this dooms the claims against Isenstein-Pasquinelli as well as those against the Koniceks.

**J.**

It is not hard to appreciate why Ocean Atlantic may have thought that all but the formalities were over once it had secured signatures on the offers it had extended to Aurora Christian and the Koniceks. The offers arguably covered the most salient aspects of Ocean Atlantic's proposed purchase of the two properties. All that remained in each case was for Ocean Atlantic to draft and the parties to execute a contract consistent with the parameters specified in the offer and otherwise flesh out the logistics of the purchase and sale. But each offer makes clear that the execution of such a contract was no mere formality. Each offer describes itself as a memorialization of "some of the parameters" for Ocean Atlantic's proposed purchase of the property. Each offer also conditions the sequence of events that would culminate in the closing of the purchase upon the execution of a separate contract. Not until that contract was signed would Ocean Atlantic undertake the inspection of the property in order to confirm that the land would suit its needs, and not until that inspection was satisfactorily completed would Ocean Atlantic begin to secure the approvals it needed from local authorities to develop the property as it hoped. By conditioning the purchase and sale of each property upon the subsequent execution of a contract, the parties left themselves room to walk away from the deal. This was their right:

> Illinois law recognizes the prerogative [of contracting parties] to agree to further negotiations, even after most essential contract terms have been settled, while remaining free to back out of a pending deal until the occurrence of some later event.

*Venture Assocs.*, 987 F.2d at 432; *see also Empro Mfg.*, 870 F.2d at 426; *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1221 (7th Cir. 1988). In this case, it is true, the parties

did not state expressly that their agreement was contingent upon the subsequent execution of a contract. But they might just as well have, given that key milestones toward the purchase of each property, including the preliminary and necessary step of inspecting the property, were dependent upon the contract. The first and most reliable indicator of the parties' intent is what the parties wrote, *see, e.g.*, *Venture Assocs.*, 987 F.2d at 432, and here the terms of the offers disclose an intent to be bound not by those preliminary writings but only by the contracts that were never signed. It is therefore our task to send Ocean Atlantic home disappointed. *Empro Mfg. Co.*, 870 F.2d at 426.

## III.

We AFFIRM the judgments below.

## APPENDIX A

August 5, 1999

**VIA FACSIMILE/FEDERAL EXPRESS**

Aurora Christian Schools, Inc.
15 Blackhawk Street
Aurora, Illinois 60506

Re: Proposed Purchase and Sale of Approximately 78 Acres of Land Located on the West Side of Deerpath Road, North of I-88 in Kane County, Illinois, and Further Described as Parcel Number 1 on Exhibit "A" (Attached).

Gentlemen:

This Letter Offer ("Offer") will serve to set forth some of the parameters for an offer from Ocean Atlantic Development Corp., ("Purchaser") to purchase the above-referenced property (herein referred to as the "Property") from the Aurora Christian Schools, Inc. ("Seller"):

1.) PURCHASE PRICE. The purchase price shall be THREE MILLION FIVE HUNDRED AND TEN THOUSAND DOLLARS ($3,510,000) subject to the verification of acreage and based upon a prorata purchase price of $45,000 per acre (the "Purchase Price").

2.) TERMS OF PAYMENT. The Purchaser shall pay the entire Purchase Price, less the Deposit, in cash on the Closing Date.

3.) INSPECTION PERIOD. The acquisition of the Property by the Purchaser shall be subject to an inspection period ("Inspection Period") commencing upon the date that a Contract of Purchase and Sale ("Contract") has been executed by the parties hereto and extending for a period of ninety (90) days. During the Inspection Period, the Pur-

chaser, at its sole cost and expense, will have complete access to the Property for the purpose of conducting such soil borings, engineering tests, environmental studies, and other studies as required with respect to the Property in order to determine if the Property is suitable for the Purchaser's intended use, provided, however, that Purchaser will be responsible for restoring the Property to the condition as it existed when such tests commenced. Purchaser agrees that it shall enter upon the Property at is own risk, cost and expense, together with the liability responsibility for itself, its agents and any other person or persons involved in the inspection of the Property.

4.) DEPOSIT.

a) Within Five (5) business days of the execution of the Contract of Purchase and Sale, the Purchaser shall deliver to Chicago Title & Trust ("Escrow Agent") a cash deposit, in the amount of TWENTY-FIVE THOUSAND DOLLARS ($25,000). In the event that Purchaser elects to terminate the contract during the inspection period, the deposit shall be returned to the Purchaser by the escrow agent.

b) Upon the expiration of the Inspection Period and election of Purchaser to proceed with the acquisition of the Property, the earnest money deposit shall be increased to a total of ONE HUNDRED THOUSAND DOLLARS ($100,000) and shall become non-refundable subject to the provisions hereto.

In the event Purchaser defaults in the performance of any of its obligations under the Contract of Sale, the above-mentioned Deposit shall constitute full and complete liquidated damages to the Seller on account of Purchaser's default and Seller shall have no other claims against Purchaser.

5.) ENTITLEMENTS AND GOVERNMENT APPROV-ALS. Upon the satisfactory completion of the Inspection

Period, Purchaser shall have no more than six (6) months to complete the following:

a) Apply to local municipality to obtain rezoning and final plat approval for the development.

b) Reach an agreement with the local municipality and all other applicable governing agencies to supply the Property with sufficient sanitary sewer and water capacity to accommodate the development.

c) Reach an agreement with the local municipality on the requirements for all on-site and off-site public improvements required for the development of the Property, as well as the amount of all fees that will be required.

If, after six (6) months, Purchaser has completed all of its applications for rezoning and final plat approval, and is only waiting for approval or denial, then Seller shall grant Purchaser an additional sixty (60) day period to satisfy conditions for Closing. If, after the additional sixty (60) day extension period, Purchaser has not received approval or denial, then the Purchaser shall have the option to extend the Entitlement Period beyond the additional sixty (60) day period for extended term intervals of thirty (30) days each. Purchaser shall pay Seller a non-refundable fee of FIVE THOUSAND DOLLARS ($5,000) for each thirty (30) day extension that Purchaser seeks. Such extension fee shall not be credited to the purchase price at closing.

6.) CLOSING.

a) The Closing shall occur with thirty (30) days of the annexation, rezoning and final plat approval of the Property, as defined in paragraph 5 hereto.

The Closing shall be subject to the satisfaction of the following conditions:

i.) The conditions set forth in paragraph 5 hereto.

ii.) Title to the Property at Closing shall be market-able and good of record and in fact and insurable as such at ordinary rates by a recognized title insurer free and clear of all liens and encumbrances or unacceptable exceptions.

7.) <u>RIGHT OF FIRST REFUSAL</u>. Purchaser shall have the right of first refusal to purchase Parcel(s) 2 and/or 3 in the event that Seller shall elect to sell either or both parcels.

8.) <u>SELLER'S REPRESENTATIONS</u>.

a) Seller will not further encumber the Property or negotiate, or agree to, its sale.

b) Seller will not make any written or oral commitments or representations to the applicable governmental authorities or any adjoining or surrounding property owners which would in any manner be binding upon Purchaser or interfere with Purchaser's ability to improve the Property.

c) Seller has no notice of any pending or threatened suit, petition, proceeding or application to modify or affect the zoning of the Property in a manner which would prohibit or restrict the intended use as described herein.

9.) <u>BROKERAGE</u>. Seller and Purchaser each warrant to the other that neither has dealt with any agent, broker, or finder with respect to the transaction contemplated by this Offer, other than Anderson & Associates and Grubb & Ellis who will be paid a commission by the Seller, under separate agreement which commission shall be earned, due and payable only in the event that closing occurs hereunder. Seller and Purchaser shall indemnify each other against any brokerage claims.

10.) <u>CONTRACT OF SALE</u>. Upon such acceptance and return of this Offer, Purchaser shall prepare and present to

the Seller a Contract of Purchase and Sale in accordance with the terms and provisions hereof. Purchaser and Seller shall work diligently to execute the Contract within Thirty (30) days of the execution of this Offer.

11.) <u>EXPIRATION</u>. Unless this Offer is signed by Purchaser and Seller, accepting and agreeing to its terms and provisions, returned to and received by the Purchaser by 5:00 p.m., on the tenth day after the date hereof this Offer shall be null and void.

IN WITNESS HEREOF, the parties hereto have set their hands and seals this  [6th]  day of August, 1999.

SELLER:                        PURCHASER:

AURORA CHRISTIAN            OCEAN ATLANTIC
SCHOOLS, INC.              DEVELOPMENT CORP.


By:   [Paul House]         By:   [John C. Carroll]
                          John C. Carroll
                          Executive Vice President


Its:   [President]


Date:   [8/6/99]          Date:      [8/5/99]


cc:  Kevin Gensler, Esq. - Dommermuth, Brestal, Cobine & West Ltd. (w/encl.) via facsimile
     Kane Kiernan - Grubb & Ellis (w/encl.) via facsimile

**APPENDIX B**

May 24, 2000

**VIA FACSIMILE/FEDERAL EXPRESS**

Mr. Dale Konicek
Mr. & Mrs. Wayne Konicek
c/o Jim Angelotti
CB Richard Ellis
1400 West 16th Street, Suite 350
Oak Brook, ILL [*sic*] 60523-1447

   Re: Revised Proposal for the Purchase and Sale of
      Approximately 157.64 acres of Land Located on
      the North Side Ogden Avenue (Rt. 34) at its
      Intersection with Bristol Road and South of
      Kennedy Road, in Kendall County, Illinois as
      Set Forth on: i.) Tax Map Numbers 02-14-352-
      001, 02-15-477-001, 02-23-126-001; and, ii.)
      Exhibit "A" Attached

Dear Mrs. Konicek and Mssrs Konicek:

This Letter Offer ("Offer") will serve to set forth some of the parameters for an offer from Ocean Atlantic Chicago Corp., ("Purchaser") to purchase the above-referenced property (herein referred to as the "Property") from Dale Konicek, and Wayne and Lois Konicek ("Sellers"):

1.) <u>PURCHASE PRICE</u>. The purchase price shall be THREE MILLION NINE HUNDRED NINETY TWO THOUSAND TWO HUNDRED AND THIRTY-THREE DOLLARS ($3,992,233) subject to the verification of acreage and based upon a prorata purchase price of $25,325 per acre (the "Purchase Price").

2.) <u>TERMS OF PAYMENT</u>. The Purchaser shall pay the entire Purchase Price, less the Deposit, in cash on the Closing Date.

3.) <u>INSPECTION PERIOD</u>. The acquisition of the Property by the Purchaser shall be subject to an inspection period ("Inspection Period") commencing upon the date that a Contract of Purchase and Sale ("Contract") has been executed by the parties hereto and extending for a period of ninety (90) days. Until Closing, the Purchaser, at its sole cost and expense, will have complete access to the Property for the purpose of conducting such soil borings, engineering tests, environmental studies, and other studies as required with respect to the Property in order to determine if the Property is suitable for the Purchaser's intended use, provided, however, that Purchaser will be responsible for restoring the Property to the condition as it existed when such tests commenced. Purchaser agrees that it shall enter upon the Property at its own risk, cost and expense, together with the liability responsibility for itself, its agents and any other person or persons involved in the inspection of the Property.

4.) <u>DEPOSIT</u>.

a) Within Five (5) business days of the execution of the Contract of Purchase and Sale, the Purchaser shall deliver to Chicago Title & Trust ("Escrow Agent") a cash deposit, in the amount of FIFTY THOUSAND DOLLARS ($50,000). In the event that Purchaser elects to terminate the contract during the inspection period, the deposit shall be returned to the Purchaser by the escrow agent.

b) Upon the expiration of the Inspection Period and election of Purchaser to proceed with the acquisition of the Property, the earnest money deposit shall be increased to a total of ONE HUNDRED THOUSAND DOLLARS ($100,000) and shall become non-refundable subject to the provisions hereto. Purchaser shall instruct the Escrow

Agent to release FIFTY THOUSAND DOLLARS ($50,000) of the Deposit to the Sellers.

In the event Purchaser defaults in the performance of any of its obligations under the Contract, the above-mentioned Deposit shall constitute full and complete liquidated damages to the Sellers on account of Purchaser's default and Sellers shall have no other claims against Purchaser.

5.) ENTITLEMENTS AND GOVERNMENT APPROVALS. Upon the satisfactory completion of the Inspection Period, Purchaser shall have no more than six (6) months to complete the following:

a)   Apply to local municipality to obtain rezoning and final plat approval for the development.

b)   Reach an agreement with the local municipality and all other applicable governing agencies to supply the Property with sufficient sanitary sewer and water capacity to accommodate the development.

c)   Reach an agreement with the local municipality on the requirements for all on-site and off-site public improvements required for the development of the Property, as well as the amount of all fees that will be required.

If, after six (6) months, Purchaser has completed all of its applications for rezoning and final plat approval, and is only waiting for approval or denial, then Sellers shall grant Purchaser an additional sixty (60) day period to satisfy conditions for Closing. If, after the additional sixty (60) day extension period, Purchaser has not received approval or denial, then the Purchaser shall have the option to extend the Entitlement Period beyond the additional sixty (60) day period for extended term intervals of thirty (30) days each. Purchaser shall pay Sellers a non-refundable fee of FIVE THOUSAND DOLLARS ($5,000) for each thirty (30) day extension that Purchaser seeks.

6.) <u>CLOSING</u>.

a)   The Closing shall occur within thirty (30) days of the annexation, rezoning and final plat approval of the Property, as defined in paragraph 5 hereto.

b)   The Closing shall be subject to the satisfaction of the following conditions:

  i.)   The conditions set forth in paragraph 5 hereto.

  ii.)  Title to the Property at Closing shall be marketable and good of record and in fact and insurable as such at ordinary rates by a recognized title insurer free and clear of all liens and encumbrances or unacceptable exceptions.

7.) <u>SELLER'S REPRESENTATIONS</u>.

a)   Sellers will not further encumber the Property or negotiate, or agree to, its sale.

b)   Sellers will not make any written or oral commitments or representations to the applicable governmental authorities or any adjoining or surrounding property owners which would in any manner be binding upon Purchaser or interfere with Purchaser's ability to improve the Property.

c)   Seller [sic] has no notice of any pending or threatened suit, petition, proceeding or application to modify or affect the zoning of the Property in a manner which would prohibit or restrict the intended use as described herein.

d)   Purchaser and Sellers agree to keep the terms and conditions and all negotiations regarding this Letter Offer confidential.

8.) <u>BROKERAGE</u>. Sellers and Purchaser each warrant to the other that neither has dealt with any agent, broker, or

finder with respect to the transaction contemplated by this Offer, other than Jim Angelotti and Tony Gange of CB Richard Ellis who will be paid a commission by the Purchaser, under separate agreement which commission shall be earned, due and payable only in the event that closing occurs hereunder. Sellers and Purchaser shall indemnify each other against any brokerage claims.

9.) INSURANCE COVERAGE. Prior to the initiation of any ingress or egress to the Property the Purchaser shall obtain liability insurance in the amount of $1,000,000 naming the Seller [sic] as an additional insured party. Similarly, the Seller shall provide evidence of current liability coverage to the Purchaser.

10.) CROP DAMAGE. In the event that there is any damage to existing crops, the Purchaser shall reimburse the Seller [sic] $350 per acre, the acreage affected shall be determined by an independent surveyor.

11.) LIKE-KIND EXCHANGE. Purchaser agrees to cooperate with Sellers to effect a Like-Kind Exchange, as defined within Internal Revenue Code 1031. All costs associated with the Like-Kind Exchange shall be paid by Sellers.

12.) CONTRACT OF SALE. Upon such acceptance and return of this Offer, Purchaser shall prepare and present to the Sellers a Contract of Purchase and Sale in accordance with the terms and provisions hereof.

13.) EXPIRATION. Unless this Offer is signed by Purchaser and Sellers, accepting and agreeing to its terms and provisions, returned to and received by the Purchaser by 5:00 p.m., on the fifth day after the date hereof this Offer shall be null and void.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals this [31st] day of May, 2000.

SELLERS:                                 PURCHASER:

                                         OCEAN ATLANTIC
                                         CHICAGO CORP.


     [Dale Konicek]             By:   [John C. Carroll]
      Dale Konicek                  John C. Carroll
                                    Executive Vice President

Date:   [5/31/2000]              Date:     [5/24/2000]


     [Wayne Konicek]
      Wayne Konicek

Date:   [5-31-2000]


     [Lois Konicek]
      Lois Konicek

Date:    [5-31-2000]


A true Copy:

        Teste:

                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*


USCA-02-C-0072—3-14-03